UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:19-cv-60777-MOORE/HUNT

W1 OPTIMUM PARTNERS, LLC
A Delaware Limited Liability Company,

      Plaintiff,

v.

WHITE ROCK DMCC, a Dubai Multi
Commodities Centre Free Zone Entity,

      Defendant.

_____/

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant, White Rock DMCC (hereinafter "White Rock" or "Defendant"), for its Answer, Affirmative Defenses and Counterclaim, responds and allege as follows:

## ANSWER

1.      Defendant admits so much of Paragraph "1" as it alleges that the amount in controversy exceeds $75,000. Defendant denies the remaining allegations contained in the Paragraph.

2.      Defendant admits so much of Paragraph "2" as it alleges that the dispute centers over the Terms of Business between the two parties, and respectfully refers this body to the entire Terms of Business.

3.      Admit the allegations contained in paragraph "3" of the Complaint.

4.      Admit the allegations contained in paragraph "4" of the Complaint.

5.      Deny each and every allegation contained in paragraph "5" of the Complaint.

6.      Admit the allegations contained in paragraph "6" of the Complaint.

7.      Deny knowledge sufficient to form a belief as to the truth of each and every allegation contained in paragraph "7" of the Complaint.

8.      Admit the allegations contained in paragraph "8" of the Complaint.

9.      Admit the allegations contained in paragraph "9" of the Complaint.

10.     Admit the allegations contained in paragraph "10" of the Complaint.

11.     Deny the allegations contained in paragraph "11" of the Complaint and aver that the Terms of Business were completed and submitted by Plaintiff to Defendant for signature with minimal edits from Defendant.

12.     Admit the allegations contained in paragraph "12" of the Complaint.

13.     Admit the allegations contained in paragraph "13" of the Complaint.

14.     Deny the allegations contained in Paragraph "14" of the Complaint.

15.     Admitted as to Paragraph "15" to the extent that it reflects the specific language contained in the Terms of Business, as written by Plaintiff, but deny that it accurately describes the relationship and agreement between the parties through their course of dealing.

16.     Deny each and every allegation contained in paragraph "16" of the Complaint.

17.     Admitted as to Paragraph "17" to the extent it reflects the specific language contained in the Terms of Business, but avers that the potential investors were contained in Schedule 2 of the Terms of Business, and were amended by consent of the Parties to include additional identified investors. Defendant denies the remaining allegations.

18.     Deny each and every allegation contained in paragraph "18" of the Complaint.

19.     Deny each and every allegation contained in paragraph "19" of the Complaint.

20.     Admit as to Paragraph "20" only to the extent that it reflects specific language in the Terms of Business Clause 2.1, deny the remaining allegations contained in the paragraph.

21.     Deny the allegations contained in paragraph "21," and aver that the first meeting of the parties and ICD was in February, 2016.

22.     Admit as to Paragraph "22" to the extent that the "El Maximo Ranch" was one of the investment opportunities presented to Plaintiff and ICD, deny the remaining allegations contained in the paragraph.

23.     Admit the allegations contained in paragraph "23" of the Complaint.

24.     Deny each and every allegation contained in paragraph "24" of the Complaint.

25.     Deny each and every allegation contained in paragraph "25" of the Complaint.

26.     Deny each and every allegation contained in paragraph "26" of the Complaint.

27.     Admit as to Paragraph "27" to the extent that a co-equity investment was discussed, deny the remaining allegations of the paragraph.

28.     Admit as to Paragraph "28" that Plaintiff sought financing, deny the remaining allegations contained in the paragraph.

29.     Deny each and every allegation contained in paragraph "29" of the Complaint.

30.     Deny each and every allegation contained in paragraph "30" of the Complaint.

31.     Deny each and every allegation contained in paragraph "31" of the Complaint.

32.     Admit as to Paragraph "32" to the extent that Optimum did seek funding from various sources, deny the remaining allegations of the paragraph.

33.     Deny each and every allegation contained in paragraph "33" of the Complaint.

34.     Deny each and every allegation contained in paragraph "34" of the Complaint.

35.     Admit the allegations contained in paragraph "35" of the Complaint.

36.     Deny each and every allegation contained in paragraph "36" of the Complaint.

37.     Deny each and every allegation contained in paragraph "37" of the Complaint.

## COUNT I: DECLARATORY RELIEF
### (Pursuant to 28 U.S.C. §§ 2201-2202

38.      Defendant incorporates by reference each and every response to the allegations re-alleged by Plaintiff as if each response were fully set forth herein.

39.      Deny each and every allegation contained in paragraph "39" of the Complaint.

40.      Deny each and every allegation contained in paragraph "40" of the Complaint.

41.      Deny each and every allegation contained in paragraph "41" of the Complaint.

42.      Admit as to Paragraph "42" to the extent that Defendant's counsel sent a letter on January 3, 2019, and deny the remaining allegations contained in the paragraph.

43.      Deny each and every allegation contained in paragraph "43" of the Complaint.

44.      Deny each and every allegation contained in paragraph "44" of the Complaint.

45.      Deny each and every allegation contained in paragraph "45" of the Complaint.

46.      Deny each and every allegation contained in paragraph "46" of the Complaint.

47.      Deny each and every allegation contained in paragraph "47" of the Complaint.

48.      Deny each and every allegation contained in paragraph "48" of the Complaint.

## AFFIRMATIVE DEFENSES

Defendant asserts the following defenses and affirmative defenses, without admitting any allegation of the Complaint and without assuming the burden of proof when such burden would otherwise be on Plaintiff.  Defendant reserves the right to amend this answer with additional defenses and affirmative defenses as discovery commences and progresses in this action.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

Plaintiff's claims and demands for relief are barred, in whole or in part, by the doctrine of

4

unclean hands.

### Third Affirmative Defense

Plaintiff's claims and demands for relief are barred, in whole or in part, by the doctrine of laches.

### Fourth Affirmative Defense

Plaintiff's claims and demands for relief are barred, in whole or in part, by the doctrine of estoppel.

### Fifth Affirmative Defense

Plaintiff's claims and demands for relief are barred, in whole or in part, by the doctrine of waiver.

### Sixth Affirmative Defense

Plaintiff's claims and demands for relief are barred, in whole or in part, by the doctrine of acquiescence.

### Seventh Affirmative Defense

Plaintiff's claims and demands for relief seeks a factual determination on the parties' past actions, which is improper grounds for Declaratory Judgment.

### Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on account of its own breaches and wrongful conduct.

### Ninth Affirmative Defense

Defendant reserves its right to assert additional defenses based upon additional facts or information learned during the discovery.

## COUNTERCLAIM

Defendant/Counterclaim-Plaintiff, White Rock DMCC (hereinafter, "White Rock"), by Payton & Associates, its attorneys for its Counterclaim, hereby alleges as follows upon knowledge as to its own action and upon information and belief as to the actions of others.

## PARTIES

1.       White Rock is a marketing and financial consulting firm organized and existing pursuant to the laws of the United Arab Emirates, and whose registered office is at Unit No: 62 DMCC Business Centre, Level No. 1, Jewellery & Gemplex 3, Jumeriah Lakes Tower, Dubai, United Arab Emirates.

2.       W1 Optimum Partners LLC ("Optimum") is a Delaware company having its registered office at 3411 Silverside Road, Wilmington, Delaware 19810.

## JURISDICTION AND VENUE

3.       This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(1) in that (i) the matters in controversy exceed the sum or value of $75,000 exclusive of interest and costs, and (ii) the dispute is between business entities of different countries (namely, United Arab Emirates and U.S.).

4.       Venue is proper in this judicial district and division pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of property that is the subject of the action is situated here.

## FACTUAL BACKGROUND

5.       On or about November 21, 2015, White Rock and Optimum entered in to a Terms of Business Agreement (the "Terms of Business") in which Optimum wished to engage White Rock services to promote investment opportunities for Optimum. A true and correct copy of the Terms of Business is attached hereto as **Exhibit A**.

6

6.      The Terms of Business Agreement was drafted by Optimum with minimal input by White Rock, and then signed by both White Rock and Optimum.

7.      Pursuant to the Schedule 1 of the Agreement White Rock

> will be entitled to a Commission fee of 25% of <u>all</u> the revenues generated from each investment introduced by [White Rock] (see Schedule 2). The fees may compromise annual management fee, acquisition fee, performance fee, a profit sharing incentive fee and will be negotiated between [Optimum] and the investors on a case by case basis.

8.      Pursuant to Clause 11 of the Agreement:

> At any time prior to the expiration of two years from the date of this agreement, it is expressly agreed that the identities of any individual or entity and any other third party (including, without limitation, suppliers, customers, financial sources, manufacturers and consultants) introduced by White Rock DMCC in respect of the Purposes and any related business opportunity shall constitute Confidential Information and the Company or any Group company or associated entity or individual shall not (without the prior written consent of, or having entered into a commission agreement with, the White Rock DMCC): (a) directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertakings with any such third party identified or introduced by White Rock DMCC; or (b) seek to by-pass, compete, avoid or circumvent White Rock DMCC from any business opportunity that relates to the  Purpose by utilizing any confidential information or by otherwise exploiting or deriving any benefit from the Confidential Information.

> During the two year Non Circumvention period, the Company should obtain approval and negotiate compensation terms with the Introducer in the event an introduced investor as per Schedule 2 intends to enter business with the Company.

9.      On or about March 6, 2016, White Rock and Optimum entered into an Update to Terms of Business ("Updated Agreement") which updated Schedule 2 of the Agreement. A true and correct copy of the Updated Agreement is attached hereto as **Exhibit B**.

10.     The Updated Agreement lists the Investment Corporation of Dubai ("ICD") as an investor introduced by White Rock to Optimum. **Exhibit B**.

11.     On September 2, 2015, White Rock approached Optimum about their interest in co-investment deals, and a representative of Optimum responded "Co-investments are a great option for investors wanting to share the risk." **Exhibit C**, page 4.

12.     On February 29, 2016, White Rock arranged the first introduction and "Meeting" of ICD and Optimum, where three properties were introduced for a potential investment opportunity, including the El Maximo Ranch ("El Maximo"), an approximately 38,000-acre Ranch located in Osceola County, Florida.

13.     A second meeting was held with the principals of ICD, Optimum and White Rock on April 24, 2016.

14.     Beginning on May 18, 2016, Optimum began to directly communicate with ICD, excluding White Rock from the emails, and only forwarding the communications to White Rock after the fact. See **Exhibit D**.

15.     A site inspection of the El Maximo Ranch was conducted around the end of May, 2016, with principals from Optimum, ICD and White Rock in attendance.

16.     Following the Site Inspection, Optimum again contacted ICD directly, without including White Rock in the communications. See **Exhibit E**.

17.     On June 2, 2016, White Rock specifically requested that Optimum keep White Rock "in the loop" with conversations with ICD, to which a representative of Optimum responded that they would. See **Exhibit F.**

8

18.     Despite the June 4, 2016 agreement to include White Rock on communications with ICD, Optimum continued to communicate directly with ICD and excluded White Rock from the communications.  See **Exhibit G**.

19.     On August 4, 2016, White Rock again specifically requested that Optimum include White Rock on all communications with ICD, and Optimum's response was "Ok no probs."  See **Exhibit H**.

20.     On October 3, 2016, Optimum again contacted ICD directly regarding investment in El Maximo, without including White Rock in the communication.  See **Exhibit I**.

21.      On October 24, 2016, White Rock again informed Optimum that it needed to be included on all messages to White Rock client, and informing Optimum that White Rock had met with ICD to represent Optimum and to "revive this deal as it was near dead."  See **Exhibit J**.

22.     On October 29, 2016, Optimum provided White Rock with its PowerPoint presentation to ICD regarding the El Maximo proposal for review and comments.  See **Exhibit K**.

23.     On October 30, 2016, White Rock responded with substantive suggestions to improve the presentation to ICD.  See **Exhibit L**.

24.     On October 30, 2016, Optimum submitted the presentation to ICD, and included White Rock in the exchange.  See **Exhibit M**.

25.     In November, 2016, White Rock and Optimum were actively working together to help finalize the El Maximo deal.  See **Exhibit N**.

26.     Despite White Rock's assistance and request to be included on all communication, by December 2016 White Rock was again being excluded from communication with ICD.  See **Exhibit O**.

27.     In March, 2017, Optimum and ICD entered into a Shared Purchase Agreement for the El Maximo Ranch.

28.     On April 11, 2017, Optimum and White Rock had further discussions regarding the El Maximo Ranch and the proposed investment, with White Rock providing Optimum with advice and strategies for the El Maximo negotiations.  See **Exhibit P**.

29.     On April 13, 2017, Optimum again circumvented White Rock to have direct communication with ICD regarding funding, and only forwarded the communication to White Rock after the fact.  See **Exhibit Q.**

30.     On April 19, 2017, White Rock was actively communicating with Optimum and participating in strategy sessions for ICD and the El Maximo deal.  See **Exhibit R.**

31.     In June 2017, Optimum requested feedback and assistance from White Rock regarding the investment model for the Maximo negotiation, and White Rock assisted Optimum with finalizing the investment model.  See **Exhibit S**, **Exhibit T.**

32.     On June 14, 2017, Optimum <u>thanked</u> White Rock for all of their input and work helping with the El Maximo deal.  See **Exhibit U.**

33.     On June 14, 2017, Optimum admitted that White Rock was actively working on its behalf with ICD on the El Maximo deal.  See **Exhibit V**

34.     As of January 11, 2018, White Rock was actively working with Optimum to fine tune presentations to ICD on the EL Maximo deal to help finalize and ultimately execute the investment deal.  See **Exhibit W.**

35.     On May 1, 2018, more than two years after the first introduction of ICD to Optimum and after the El Maximo deal had been fully executed and completed, Optimum suddenly sought to change the terms of the agreement set forth in the Terms of Business, when Optimum discussed

10

White Rock being a "partner" in the deal rather than paying the agreed upon commission.  See **Exhibit X.**

36.     On May 9, 2018, Optimum inexplicably took the position that the contract between the parties only covered 100% equity investments and that White Rock was only entitled to 25% of net revenues, ultimately proposing an alternative compensation structure for the El Maximo deal.  See **Exhibit Y.**

37.     Optimum's email on May 9, 2018 <u>admits</u> that White Rock is, in fact, entitled to compensation for the El Maximo deal.  See **Exhibit Y**.

38.     On May 30, 2018, White Rock requested, pursuant to Clause 10 under the Terms of Business, that an independent auditor be appointed to resolve the question of the fees due to White Rock for the El Maximo deal.  See **Exhibit A**, **Exhibit Z**.

39.     Having received no response from Optimum with regard to an independent auditor, on January 3, 2019, Plaintiff's counsel sent a letter to Optimum demanding payment for the Commission owed for the El Maximo Deal.  See **Exhibit AA.**

<u>**COUNT I**</u>
**Breach of Contract for Commissions Due**

40.     Paragraphs 1-39 are repeated and realleged as if fully set forth herein.

41.     White Rock and Optimum entered into a valid contract on November 24, 2015.

42.     White Rock introduced Optimum to ICD, and was instrumental in the ongoing negotiations and ultimate execution of the El Maximo deal.

43.     Optimum continuously tried to exclude White Rock from the ongoing negotiations and to communicate directly with ICD itself.

44.     Optimum continued to contact White Rock for assistance in finalizing the El Maximo deal, including assistance in presentations to ICD and preparing financial projections for the project.

45.     After almost three years of dealings under the Terms of Business with a set compensation agreement, and two years after White Rock introduced and began working with Optimum and ICD, Optimum suddenly sought to unilaterally change the terms and conditions of compensation.

46.     Despite initially recognizing that White Rock was entitled to compensation for its continued involvement in the El Maximo Deal, Optimum has since taken the position that White Rock is not entitled to compensation for the El Maximo deal.

47.     White Rock performed its obligations under the Terms of Business governing the parties.

48.     Optimum has refused to the appointment of an independent auditor as set forth in the Terms of Business, Clause 10.

49.     Despite repeated demands, Optimum has refused to agree on any compensation for White Rock for the services that it provided.

## COUNT II
**Breach of Contract for Breach of the Non-Circumvention Agreement**

50.     Paragraphs 1-49 are repeated and realleged as if fully set forth herein.

51.     White Rock and Optimum entered into a valid contract on November 24, 2015 that contained an enforceable non-circumvention clause.

52.     White Rock introduced Optimum to ICD, which is identified in the modified Schedule 2 as one of the "investors introduced by the Intermediary to the Company." See **Exhibit B.**

12

53.     White Rock expressly notified Optimum of its desire to be included in all communications and negotiations between Optimum and ICD for the El Maximo negotiations.

54.     Optimum actively excluded White Rock from the ongoing negotiations and instead communicated directly with ICD itself.

55.     White Rock performed its obligations under the Terms of Business governing the parties.

56.     Throughout the course of the El Maximo negotiations, Optimum continued to "by-pass, compete, avoid or circumvent White Rock DMCC from any business opportunity that relates to the Purpose by utilizing any confidential information or by otherwise exploiting or deriving any benefit from the Confidential Information." **Exhibit A**.

57.     Optimum is now asserting that its dealings with ICD were not covered under the Terms of Business, and thus White Rock is not entitled to any compensation for any reason for the El Maximo deal.

58.     Despite repeated demands, Optimum has refused to agree on any compensation for White Rock for the services that it provided.

## <u>COUNT III</u>
### Breach of Implied Covenant of Good Faith and Fair Dealing

59.     Paragraphs 1-58 are repeated and realleged as if fully set forth herein.

60.     White Rock and Optimum entered into a valid contract on November 24, 2015.

61.     White Rock performed all, or substantially all, of the significant things that the contract required it to do; alternatively, White Rock was excused from having to do those things by reason of Optimum's breach of the non-circumvention clause of the contract.

62.     All conditions required for Optimum's performance had occurred.

63.     Optimum's actions unfairly interfered with White Rock's receipt of the contract benefits.

64.     Optimum's conduct did not comport with White Rock's reasonable contractual expectations under specific parts of the contract.

65.     White Rock was harmed by Optimum's conduct.

## COUNT IV
### Quantum Meruit

66.     Paragraphs 1-65 are repeated and realleged as if fully set forth herein.

67.     Optimum requested and acquiesced in the services provided by White Rock related to the introduction and assistance in identifying, presenting and securing investment opportunities for Optimum with investors in the Middle East, including ICD.

68.     Optimum was aware that White Rock expected to be compensated for those services.

69.     White Rock provided the services to Optimum, ultimately resulting in the El Maximo Ranch deal being fully finalized and executed with ICD, including but not limited to, introducing Optimum to ICD, assistance in presentations to ICD, assistance in valuation calculations, and ultimately helping Optimum finalize the El Maximo deal with ICD.

70.     Optimum was unjustly enriched thereby.

71.     Accordingly, White Rock is entitled to the reasonable value of the labor for its services provided to Optimum.

## COUNT V
### Unjust Enrichment

72.     Paragraphs 1-71 are repeated and realleged as if fully set forth herein.

73.     Optimum was enriched by the efforts and from the services provided by White Rock related to the introduction and assistance in identifying, presenting and securing investment opportunities for Optimum with investors in the Middle East, including Dubai.

74.     Optimum received the benefits of White Rock's efforts without paying for them, and was thereby unjustly enriched.

75.     White Rock is without an adequate remedy at law.

76.     Optimum retained the benefits of White Rock's efforts and services - namely, (1) the introduction of ICD as investor for the El Maximo Ranch deal, (2) White Rock's assistance in presentations to ICD, (3) White Rock's assistance in valuation calculations, and (4) ultimately helping Optimum finalize the El Maximo deal with ICD – under circumstances that make it inequitable for Optimum to do so without paying the value of it.

77.     Optimum was unjustly enriched thereby.

## DEMAND FOR RELIEF

**WHEREFORE**, Defendant/Counterclaim-Plaintiff White Rock DMCC prays that this Court enter judgment in its favor and against Plaintiff/Counterclaim-Defendant W1 Optimum Partners as follows:

(a)     Finding that W1 Optimum Partners has breached its contract with White Rock DMCC;

(b)     Awarding White Rock DMCC be compensated by payment of 25% of all revenues generated from the El Maximo Ranch deal as set forth in the Terms of Business;

(c)     Awarding White Rock DMCC consequential damages against W1 Optimum Partners;

15

(d)     Awarding White Rock DMCC the reasonable value for the services and assistance that it provided Optimum;

(e)     Awarding White Rock DMCC the reasonable value of the benefit conferred on Optimum;

(f)     Ordering the parties to engage an independent auditor to resolve the compensation owed to White Rock DMCC for the El Maximo deal;

(g)     Awarding White Rock DMCC its reasonable fees incurred in connection with this action;

(h)     Prejudgment interest at the statutory rate from the time payments came due;

(i)     Awarding White Rock DMCC its costs; and

(j)     Granting to White Rock DMCC such other and further relief as may be just and proper.

Respectfully submitted,

**PAYTON & ASSOCIATES, LLC**
*Attorneys for White Rock DMCC*
One Biscayne Tower
2 S. Biscayne Boulevard, Suite 2300
Miami, FL 33131
Tel. 305.372.3500
Email:  payton@payton-law.com
       mohorcic@payton-law.com
       smorejon@payton-law.com


By:       _____ */s/ Harry A. Payton, Esq., B.C.S.*
          Harry A. Payton, Esq., B.C.S.
          Fla. Bar No. 097527
          Susan M. Mohorcic, Esq.
          Fla. Bar No. 0597015


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic notice by the CM/ECF system this 7th day of May, 2019, on all counsel or parties of record on the service list below.


*/s/ Harry A. Payton, Esq.*
**Harry A. Payton**


## SERVICE LIST

SCOTT MAGER, ESQ.
FBN: 768502
Mager Paruas, LLC
2719 Hollywood Boulevard
1st Floor
Hollywood, FL 33020
Tel. 954-763-2800
Email:  service@magerparuas.com

# EXHIBIT A

**<u>Private and confidential</u>**


**24[st] of November 2015**


**W1 OPTIMUM PARTNERS LLC (1)**


**And**


**WHITE ROCK DMCC (2)**


**<u>TERMS OF BUSINESS</u>**

## TERMS OF BUSINESS

These TERMS OF BUSINESS are made on 21st of November 2015 between:

(1) **W1 OPTIMUM PARTNERS LLC** (the "**Company**"), a company incorporated in the United States of America with its registered office at 3411 Silverside Road, Wilmington DE 19810, United States of America

(2) **WHITE ROCK DMCC** (the "**Intermediary**"), a company incorporated in the United Arab Emirates with registered office at Unit No: 30-01-62, Jewellery & Gemplex 3, Jumeriah Lakes Tower, Dubai, United Arab Emirates

## 1. Scope

1.1. These Terms of Business set out the terms and conditions on which the Company will accept business from the Intermediary.

The company wishes to engage the services of the Intermediary to promote the Investments to Clients and to submit Business to the Company the details of which are contained within this Agreement and its Schedules hereto.

The parties have agreed that this Agreement and its Schedules shall govern the terms of the services to be provided by the Intermediary.

"**Business**" shall mean monies introduced in relation to Investments.

"**Client**" shall mean any person, firm, company or other undertaking who is a past, present or potential holder of any Investment.

"**Investments**" shall mean, direct investments, financial products and services available for promotion by the Intermediary detailed in Schedule 1 to these Terms of Business, or such other investments as may be agreed by the Company and the Intermediary from time to time.

1.2. The Intermediary warrants that it will not submit Business to the Company on behalf of a Client unless it has full authority to do so from such a Client. The Intermediary warrants that it shall not submit Business to the Company if it would be unlawful to do so under any laws, regulations or rules applicable to the Intermediary or the Client.

1.3 The Intermediary agreed that, in relation to all aspects of the Business submitted to the Company on behalf of a Client, it will act solely as the agent of that Client, except in so far as shall be necessary to give effect to the personal responsibilities of the Intermediary to the Company as set out in these Terms of Business. The Intermediary warrants that it will not in any circumstances act, or be take an step or make any statement which lead to the Client or any third party to have reason to believe that it was authorised to act as, or hold itself out as agent of the Company in relation to any aspect of such business.

1.4 Any agent appointed, formally or otherwise by the Intermediary as part of its network of financial advisors shall procure that the terms of business that it enters into any such agent shall prohibit the agent from acting as, or holding itself out as being authorised to act as, the agent of the Company. The Intermediary will act in good faith and with choice and use of an agent pursuant to this clause.



1.5 The Intermediary will procure observance by all agents of all the obligations of the Intermediary under the terms of these Terms of Business.

1.6 The Intermediary shall immediately inform the Company if it becomes suspicious, or has grounds to believe that any of its agents are acting in a fraudulent or dishonest manner in connection with the Company or the Products.

1.7 The Intermediary agreed to comply with the reasonable requirements notified to it by the Company from time to time for the purpose of assisting the Company to comply with any laws, regulations or rules applicable to the Company.

1.8 These Terms of Business are personal to the Intermediary who shall not be entitled to assign or in any way part with any of its obligations under them without the prior written consent of the Company.

1.9 The Company reserves the right at any time, in its absolute discretion, not to accept any or all Business submitted by the Intermediary. Should the company advise that all business will not be accepted then this shall be construed as termination of the agreement in accordance with Clause 8.5.

**2 Commission**

2.1 A commission will be paid by the Company to the Intermediary on business introduced and where the Intermediary continues to act as the point of contact between the Client and the Company and generally maintains the Client relationship.

2.2 The Company shall pay the Intermediary a commission according to Schedule 1 and the terms set by each individual Investment.

2.3 The Company will credit or pay commission on Business submitted to the Company by the Intermediary and accepted by the Company, but subject to the other provisions of these terms of Business. Such commission shall be paid at the rate (s) of commission applicable to the relevant Investments(s) at the time the Business is accepted, which shall be as set out in Schedule 1, otherwise agreed in writing between the Company and the Intermediary.

2.4 Commission shall continue to be payable to the Intermediary in respect of a Client of the Intermediary until such time as the Client withdraws the Investment, provided that, notwithstanding any other provision of this Terms of Business, the Intermediary will be entitled to commissions only in respect of monies invested on or before the date on which notice of Termination of the Intermediary's appointment is given in accordance with these Terms of Business.

2.5 The Intermediary is entitled to Commissions on new Investments where the initial investor was brought by the Intermediary during the period of this agreement. For the avoidance of doubt, the Intermediary and the Company should agree in writing on the list of investors introduced by the Intermediary as per Schedule 2 (updated quarterly by both parties) and the amount of the investments. Furthermore, if one of the clients introduced by the Intermediary invests with the Company, the Company will pay the Intermediary the same Commission as defined in Schedules 1 of this Agreement.

2.6 For the avoidance of doubt, the Intermediary shall be entitled to continue receiving commission after the termination of this agreement, unless commission ceases to be payable in terms of any of the provisions of this agreement. Only pursuant to the provisions in paragraphs 8.4 and 8.5 below will the commission cease to be payable to the Intermediary.

3



2.7 No commission will be payable to the Intermediary until a completed Intermediary Application Form, including all attachments, which is an integral part of these Terms of Business, has been received and approved by the Company nor until the Business has been completed (including the receipt by the Company of all relevant documents for that Business, duly completed by the Client, the information or duly completed form relating to verification of the Client identify referred to in paragraph 4 below and all monies relating to the proposed investment).

2.8 If a Client withdraws from or rescinds a transaction in accordance with any right available to him under the laws of any competent jurisdiction applicable to the relevant Business or otherwise for any reason whatsoever, no commission will be payable by the Company to the Intermediary after such withdrawal or rescission.

2.9 The Company's statement of account (which may be by letter or electronic) shall be the definitive record of commission due to the Intermediary and of any money due to the Company by the Intermediary and shall be binding on the Intermediary unless any manifest error in any statement is established.

2.10 Commission shall be payable in the currency in which the Company charges its fees in respect of the relevant Business.

**3 Documentation / Information**

3.1 The Intermediary shall pass on immediately, without amendment, any documentation which is supplied by the Company for information of, or for the benefit of, or completion by, any Client of the Intermediary on behalf, or respect of such Client.

3.2 The Intermediary will produce to the Company on demand such records, books and accounts in such manner and form as the Company may reasonably require in connection with Business submitted by the Intermediary to the Company.

3.3 All books, papers, records and other items of property belonging to the Company and in possession or under the control of the Intermediary must at all times be available for inspection and be delivered in good condition to the Company by the Intermediary on demand.

3.4 Without prejudice to paragraph 1.3 above, the Intermediary shall not publish, circulate, issue or make any advertisement, other document or statement which, directly or indirectly implies that the Intermediary is acting as agent for, or otherwise on behalf of, the Company or that it has power to bind the Company in any way, and shall not, without the prior written consent of the Company, use the Company's name, logo or any other trademarks or permit or suffer to be done any act or thing which would prejudice or be detrimental to the name or good will of the Company. Without limiting the generality of the foregoing, the Intermediary shall not issue any advertisement or any other document in relation to the Investments unless the Company shall have approved such advertisement or document before issue, in accordance with the parameters and guidelines or marketing applicable to the company.

3.5 Without prejudice to paragraph 3.4 above, the Intermediary shall not:

a) issue or vary any contract note, certificate, receipt or other document on behalf of the company

b) alter any information supplied by any Client for onward transmission to the Company; by the Company to the Intermediary for onward transmission to the Client.

4



3.6 Within 7 days of the Intermediary becoming aware that any information supplied by it, or on its behalf, to the Company relating to the Intermediary or its business has changed or become untrue in any material respect, the Intermediary shall notify the Company of such change and shall provide the correct information as may be necessary.

## 4 Prevention of money laundering

In connection with all Business submitted to the Company, the Intermediary undertakes:

a) to provide all information and documentation to the Company in order to verify the identity of the Clients introduced by the Intermediary, in accordance with the requirements of the Company relating to the prevention of money laundering as notified to the Intermediary from time to time;

b) to inform the Company of any case where the Intermediary is unable to provide the required information and documentation in order to verify the identity of any Client. In such circumstances, the Company will be entitled to refuse to accept such Business;

c) to inform the Company immediately if the Intermediary becomes aware of any material changes relating to a Client or if the Intermediary knows or suspects or has reasonable ground to suspect that a Client is engaged in money laundering.

## 5 Regulatory compliance by the company

<u>Delaware, United States of America</u>

## 6 Payments of monies through the Intermediary

If the Intermediary receives any monies from a Client for a payment or transmission on behalf of that Client to the Company, the Intermediary shall, subject to any instructions of such Client to the contrary, pass such monies promptly to the Company (and in doing so the Intermediary shall not be acting as agent for the Company). All monies received by the Intermediary from a Client shall be held by the Intermediary on behalf of that Client until they are paid or transmitted to the Company in accordance with that Client's instructions. The Company shall not be responsible to any Client of the Intermediary in respect of any such monies, received or held by the Intermediary on behalf of such Client, until they are received by the Company in accordance with its payment instructions from time to time in which event the Company shall only be responsible for the amount of monies actually received.

## 7 Intermediary's liability

7.1 The Intermediary shall indemnify the Company against any claims, costs, losses, expenses, liabilities or damages suffered by the Company (whether pursuant to claims against the Company by the Intermediary's Clients or otherwise) arising howsoever from the introduction of Clients to the Company by the Intermediary otherwise than in accordance with these terms of Business or in breach of any applicable laws, regulations or rules in any relevant jurisdiction r of the Intermediary's contract with any Client or from the negligence, default or fraud of the Intermediary.

7.2 The Intermediary shall accept full responsibility for the conduct of all agents appointed by the Intermediary in the course of their activities in connection with the Business and shall indemnify the Company in respect of any claims, losses, expenses, liabilities or damages suffered by the Company as a result of the acts of such agents.

7.3 Without prejudice to paragraph 7.1 above, the Intermediary shall indemnify the Company in respect of all claims, costs, losses or damages suffered by the Company arising in any manner



howsoever out of retention of or dealing with monies entrusted to the Intermediary by any Client pending onward transmission to the Company.

7.4 If the Intermediary comprises more than one individual, the liability of such individuals shall be joint and several.

**8 General**

8.1 The Intermediary shall be entitled to resign its appointment hereunder without liability by giving not less than 60 days written notice to the Company.

8.2 The Company may terminate the appointment of the Intermediary hereunder without liability by giving not less than 60days written notice to the Intermediary.

8.3 The Company may give notice to the Intermediary to the effect it is suspending these Terms of Business with immediate effect should the Intermediary go into liquidation or commit any act of bankruptcy under the relevant legislation or if a receiver is appointed over any assets owned by the Intermediary.

8.4 The Company may give notice to the Intermediary to the effect that it is suspending these Terms of Business with immediate effect should the police or any regulatory body begin investigations into the Intermediary or its business. In such circumstances, the Company shall not be under any obligation whatsoever to divulge to the Intermediary the reason for the suspension (notwithstanding that Business may have been introduced prior to the suspension). In the event the Intermediary is found guilty of any wrongful or inappropriate conduct, the Company may terminate these Terms of Business in accordance with paragraph 8.5 below.

8.5 Only in accordance with paragraph 8.4 the Company may, at its sole discretion, give notice to the Intermediary to the effect that it is (subject to paragraph 8.6 below) terminating these terms of Business with immediate effect and will not accept any further Business submitted by the Intermediary (such termination being without any liability on the Company's part). In the event of the Company serving any such notice, the Intermediary shall:

a) cease promoting the Investments of the Company;

b) return to the Company all papers, records and other items of property belonging to the Company and in possession of, or under the control of the Intermediary;

c) within 28 days of the date on which such notice is given, repay such sum as the Company shall notify to the Intermediary in writing as being due and payable to the Company;

d) be entitled to commission only with regard to monies received by the Company on or before the date on which such notice is given.

8.6 For the avoidance of doubt, paragraphs 3,5,6,7,8.7 and 8.11 of these Terms of Business shall continue to apply notwithstanding any notice served in accordance with paragraph 8.5. The Company shall (unless it determines, in its absolute discretion, otherwise) cease paying commission to the Intermediary on the termination of Business jointly pursuant to paragraphs 8.4 and 8.5.

8.7 Any waiver by the Company of, or failure by the Company to take any action in relation to, any breach of these Terms of Business by the Intermediary shall not prevent the subsequent enforcement of the relevant term and shall not be deemed to be a waiver in relation to any subsequent breach.



8.8 Any notices to be given under these Terms of Business shall be delivered in person or communicated by email and followed by the original document to be sent by air mail post to:

**By post:**

PO Box 102661
Dubai, United Arab Emirates

**By email:**

ahaider@whiterockint.com

8.8.1 in case of a notice to be given to the Intermediary, its last address or email known to the Company.

8.8.2 in the case of a notice to be given to the Company:

**By post**

W1 Optimum Partners LLC
3411 Silverside Road
Wilmington DE 19810

and shall be deemed to be served and given at the time it was delivered or (on the fifth working day following the date upon which the envelope addresses to the party to be given such notice and containing such notice was put into the post and in proving such service it shall be sufficient to prove that the envelope containing any notice was properly addressed and posted.

In the event that any one or more of the provisions contained in these Terms of Business shall be invalid or unenforceable, the validity and enforceability of the remaining provisions contained in these Terms of Business shall not in any way be affected and these Terms of Business shall continue to apply as if the invalid and/or unenforceable provision (s) had not been included.

8.10 No party hereto shall during the continuance of this terms of Business or after its termination disclose to any person, firm, company or institution whatsoever (except with the authority of the other party or as otherwise required by law) any information relating to the business, investments, finances or other matters of a confidential nature of any party of which it may in the course of its duties hereunder or otherwise become possessed and each shall use all reasonable endeavours to prevent any such disclosures as aforesaid.

8.11 These Terms of Business shall be governed by and construed in accordance with the laws of the United States of America and the Intermediary shall submit irrevocably to the non-exclusive jurisdiction of the United Stated of America Courts. The Submission to the jurisdiction of such court shall not limit the right of the Company to take proceedings against the Intermediary in any other court of competent jurisdiction.

**9 Potential conflicts of Interest**

The company understands and acknowledges that the Intermediary is not acting on an exclusive basis on behalf of the Company, and that the Intermediary has agreements similar in purpose and effect to this Agreement with other entities, and that the Company and other clients of the Intermediary may in fact have competing interests in acquiring some of the new Clients through the efforts of the Intermediary. The Company hereby consents to the existence, either at the time of this Agreement or

7



during the course of this Agreement, of such potential conflicts of interests. In this regards, the Intermediary shall in good faith present the Company's case to all appropriate prospects who the Intermediary contacts.

**10 Disputes, complaints and compensation**

10.1 Any dispute or difference as to the Intermediary commission payable hereunder shall be referred to an independent auditor who shall be appointed by mutual consent of the Company and the Intermediary and who will not be deemed to act as an arbitrator.

10.2 In relation to any dispute or difference, such auditor shall be deemed to be acting as an expert and not as an arbitrator and his determination as to the amount of such commissions shall be final and binding on the parties.

10.3 Any payment required to be made by either party in consequence of such determination shall be made within 14 days thereof.

**11 Non Circumvention**

At any time prior to the expiration of two years from the date of this agreement, it is expressly agreed that the identities of any individual or entity and any other third parties (including, without limitation, suppliers, customers, financial sources, manufacturers and consultants) introduced by White Rock DMCC in respect of the Purpose and any related business opportunity shall constitute Confidential Information and the Company or any Group company or associated entity or individual shall not (without the prior written consent of, or having entered into a commission agreement with, the White Rock DMCC): (a) directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertakings with any such third party identified or introduced by White Rock DMCC; or (b) seek to by-pass, compete, avoid or circumvent White Rock DMCC from any business opportunity that relates to the Purpose by utilising any Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information

During the two year Non Circumvention period, the Company should obtain approval and negotiate compensation terms with the Introducer in the event an introduced investor as per Schedule 2 intends to enter business with the Company

*IN WITNESS whereof this Agreement has been executed by or on behalf of the parties hereto on the day and the year above written*

Signed by _____

**For and on behalf of W1 Optimum Partners LLC**

Signed by _____

**For and on behalf of White Rock DMCC**

8

**SCHEDULE 1**

<u>INVESTMENT</u>

**W1 Optimum Partners LLC**

<u>COMMISSION FEE</u>

**(A)**

The Intermediary will be entitled to a Commission fee of 25% of <u>all</u> the revenues generated from each investment introduced by the Intermediary (see Schedule 2). The fees may comprise annual management fee, acquisition fee, performance fee, a profit sharing incentive fee and will be negotiated between the Company and the investors on a case by case.

<u>Plus</u>

**(B)**

The Intermediary will be entitled to a full reimbursement of out-of-pocket expenses previously approved by email by the Company and related exclusively to marketing of the Company's products. Expenses include travel, transportation, accommodation, entertainment and any other items that are reasonable in nature.

9

**SCHEDULE 2**

This Schedule will include the list of investors introduced by the Intermediary to the Company.

The current list of investors are:

1 HALJ

2 ALJ

3 Al Nahda

4 Vintage

5 MASIC

6 Saudi Aramco

7 Alghanim

8 Hassad Food

9 Qatar Holdings

10 Vernavest

11 Apicorp

12 Ghurair Family Office

13 AG Fund

This list will be amended from time to time, and exchanged via email, as an amendment to this agreement.

At a minimum, this list will be updated on a quarterly basis.

# EXHIBIT B

**<u>Private and confidential</u>**

**31 December 2016**

**W1 OPTIMUM PARTNERS LLC (1)**

**&**

**W1 CAPITAL MANAGEMENT LTD (1)**

**And**

**WHITE ROCK DMCC (2)**

**<u>UPDATE TO TERMS OF BUSINESS</u>**

**UPDATE TO TERMS OF BUSINESS**

Update to Schedule 2 of the TERMS OF BUSINESS made on 24th of November 2015 between **W1 OPTIMUM PARTNERS LLC** (the "**Company**") and **WHITE ROCK DMCC** (the "**Intermediary**").

Update to Schedule 2 of the TERMS OF BUSINESS made on 24th of November 2015 between **W1 CAPITAL MANAGEMENT LTD** (the "**Company**") and **WHITE ROCK DMCC** (the "**Intermediary**").

**SCHEDULE 2**

This Schedule will include the list of investors introduced by the Intermediary to the Company.  Note that the proposed investors may hold their investment either directly or indirectly or through a related company.  The current list of investors are:

1. A1 Group
2. Abudawood Group
3. Al Hokair Group
4. Agfund
5. AD Council
6. African Commodities
7. AG Fund
8. Agthia
9. Al Dahra Agriculture
10. Al Fahim Group
11. Al Ghurair
12. Al Hilal Investments
13. Al Nahda
14. Al Rajhi Holdings
15. Al Rajhi United
16. Alghanim
17. ALJ
18. Almarai
19. Apicorp
20. Alshaya
21. Asas Capital
22. Asyad Holding
23. Bin Sulaiman Group
24. Derayah Ventures
25. Eminence Investments
26. Emirates Investment Authority
27. FFA Bank
28. Fozan Holding
29. General Pension and Social Security Authority
30. Ghurair Family Office
31. Gulf Finance House
32. HALJ
33. Hassad Food
34. Hakan Agro
35. Ibdar Bank
36. IFC
37. Investment Corporation of Dubai
38. IPIC
39. JS Group
40. Kuwait International Bank
41. Lafana Group
42. MASIC
43. Massar Capital
44. Mubadala
45. Muscat Overseas
46. NADEC
47. Oman Investment Fund
48. Ominvest
49. Osool
50. Phoenix
51. QADIC
52. Qatar Holdings
53. Qatar Investment Authority
54. QInvest
55. Sabban Holdings
56. Safanad
57. SALIC
58. SAMBA
59. SANABEL
60. Savola
61. Saudi Aramco
62. SEDCO Capital
63. SGRF (Oman)
64. The Arab Investment Co.
65. Tricap Investments
66. Vernavest
67. Vintage

68. YBA Kanoo
69. ZAD Investments

70. Zeus Investments
71. Zayani Investments

This list will be amended from time to time, and exchanged via email, as an amendment to this agreement.

At a minimum, this list will be updated on a quarterly basis.

AGREED FOR WHITE ROCK DMCC

<u>**Private and confidential**</u>


**31 December 2016**


**W1 OPTIMUM PARTNERS LLC (1)**

**&**

**W1 CAPITAL MANAGEMENT LTD (1)**


**And**


**WHITE ROCK DMCC (2)**


<u>**UPDATE TO TERMS OF BUSINESS**</u>



1

## UPDATE TO TERMS OF BUSINESS

Update to Schedule 2 of the TERMS OF BUSINESS made on 24th of November 2015 between **W1 OPTIMUM PARTNERS LLC** (the "**Company**") and **WHITE ROCK DMCC** (the "**Intermediary**").

Update to Schedule 2 of the TERMS OF BUSINESS made on 24th of November 2015 between **W1 CAPITAL MANAGEMENT LTD** (the "**Company**") and **WHITE ROCK DMCC** (the "**Intermediary**").

## SCHEDULE 2

This Schedule will include the list of investors introduced by the Intermediary to the Company.  Note that the proposed investors may hold their investment either directly or indirectly or through a related company.  The current list of investors are:

1. A1 Group
2. Abudawood Group
3. Al Hokair Group
4. Agfund
5. AD Council
6. African Commodities
7. AG Fund
8. Agthia
9. Al Dahra Agriculture
10. Al Fahim Group
11. Al Ghurair
12. Al Hilal Investments
13. Al Nahda
14. Al Rajhi Holdings
15. Al Rajhi United
16. Alghanim
17. ALJ
18. Almarai
19. Apicorp
20. Alshaya
21. Asas Capital
22. Asyad Holding
23. Bin Sulaiman Group
24. Derayah Ventures
25. Eminence Investments
26. Emirates Investment Authority
27. FFA Bank
28. Fozan Holding
29. General Pension and Social Security Authority
30. Ghurair Family Office
31. Gulf Finance House
32. HALJ
33. Hassad Food
34. Hakan Agro
35. Ibdar Bank
36. IFC
37. Investment Corporation of Dubai
38. IPIC
39. JS Group
40. Kuwait International Bank
41. Lafana Group
42. MASIC
43. Massar Capital
44. Mubadala
45. Muscat Overseas
46. NADEC
47. Oman Investment Fund
48. Ominvest
49. Osool
50. Phoenix
51. QADIC
52. Qatar Holdings
53. Qatar Investment Authority
54. QInvest
55. Sabban Holdings
56. Safanad
57. SALIC
58. SAMBA
59. SANABEL
60. Savola
61. Saudi Aramco
62. SEDCO Capital
63. SGRF (Oman)
64. The Arab Investment Co.
65. Tricap Investments
66. Vernavest
67. Vintage

68. YBA Kanoo
69. ZAD Investments

70. Zeus Investments
71. Zayani Investments

This list will be amended from time to time, and exchanged via email, as an amendment to this agreement.

At a minimum, this list will be updated on a quarterly basis.

AGREED FOR WHITE ROCK DMCC

30/03/2017

# EXHIBIT C



Adnan Haider <ahaider@whiterockint.com>

## RE: Co-Investments

**Andrea Michelli-Lopez** <andrea@w1capital.com>                    7 September 2015 at 04:49
To: Adnan Haider <ahaider@whiterockint.com>, Shahnoun Zaman <shahnoun@whiterockint.com>

Shahnoun, Adnan,

I hope you had a great weekend.

As discussed, here is the NDA we would ask you to kindly sign and return to us.

Looking forward to meeting you in London, best,

Andrea

---

**From:** Adnan Haider [mailto:ahaider@whiterockint.com]
**Sent:** 04 September 2015 10:46
**To:** Andrea Michelli-Lopez <andrea@w1capital.com>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** RE: Co-Investments

Andrea

HI.  Details as noted below

**WHITE ROCK DMCC**

**Registered Address:**

Unit No: 30-01-62, Jewellery & Gemplex 3

Jumeriah Lakes Tower

Dubai, United Arab Emirates

**Mailing / Postal Address:**

PO Box 102661

Dubai, United Arab Emirates

Look forward to seeing you soon


Regards

Adnan






Adnan Haider

Managing Partner & CEO

White Rock International

T:        UAE +971 50 151 4027

Email:   ahaider@whiterockint.com

URL:     www.WhiteRockInt.com




**From:** Andrea Michelli-Lopez [mailto:andrea@w1capital.com]
**Sent:** Friday, September 4, 2015 1:30 PM
**To:** Shahnoun <shahnoun@whiterockint.com>
**Cc:** Adnan Haider <ahaider@whiterockint.com>
**Subject:** RE: Co-Investments


Shahnoun,


Great to talk to you yesterday.


Would you please send me your address so I can prepare an NDA for your to sign?


Really exciting prospects and thank you for moving our meeting to Tue 15th of September.


Best,

Andrea

**From:** Shahnoun [mailto:shahnoun@whiterockint.com]
**Sent:** 03 September 2015 12:01
**To:** Andrea Michelli-Lopez <andrea@w1capital.com>
**Cc:** Adnan Haider <ahaider@whiterockint.com>
**Subject:** Re: Co-Investments

Andrea,

Good talking to you just now.

As agreed, the meeting has now been changed to Tuesday 15th September 11am.

Please send across your NDA so you can start sharing us some of your recent deals especially this last one. Also, send us any track record and typical co-investment type structures. Keep in mind we can help structure it in a shariah manner if need be.

Enjoy Miami!

Thanks.

Kind Regards,

Shahnoun Zaman, CFA

Managing Director

White Rock International

Tel. No.: +971504287833

Email: shahnoun@whiterockint.com

URL: www.WhiteRockInt.com

On Sep 2, 2015, at 8:42 PM, Shahnoun <shahnoun@whiterockint.com> wrote:

Ok, I have another call at 12 so 1130am should be fine.

Thanks.

Kind Regards,

Shahnoun Zaman, CFA

Managing Director

White Rock International

Tel. No.: +971504287833

Email: shahnoun@whiterockint.com

URL: www.WhiteRockInt.com

On Sep 2, 2015, at 8:39 PM, Andrea Michelli-Lopez <andrea@w1capital.com> wrote:

Could it be at 1130 GMT as I am in meetings from 9-11am?

On 2 Sep 2015, at 20:32, "Shahnoun" <shahnoun@whiterockint.com> wrote:

Yes, Lets have a call tomorrow at 1030am GMT - I am on 07887 425 803.

Thanks.

Kind Regards,

Shahnoun Zaman, CFA

Managing Director

White Rock International

Tel. No.: +971504287833

Email: shahnoun@whiterockint.com

URL: www.WhiteRockInt.com

On Sep 2, 2015, at 8:27 PM, Andrea Michelli-Lopez <andrea@w1capital.com> wrote:

Shanoun,

Great to hear from you.

Could we have a quick chat tomorrow about it? We are right now involved with a US100m investment (US50m equity) but for a single family. Co-investments are a great option for investors wanting to share the risk.

Let me know a good time?

Best,

Andrea

On 2 Sep 2015, at 10:41, "Shahnoun" <shahnoun@whiterockint.com> wrote:

Hi Andrea,

Do you do co-investment type deals? Can you take north of $50mio on direct investments?

Thanks.

Kind Regards,

Shahnoun Zaman, CFA

Managing Director

White Rock International

Tel. No.: +971504287833

Email: shahnoun@whiterockint.com

URL: www.WhiteRockInt.com

📄 **W1_WhiteRock_NDA_Sep15.docx**
34K

# EXHIBIT D



**From:** javier@optimumadvisors.net
**Subject:** Fwd: RE: RE:
**Date:** May 19, 2016 at 6:34 PM
**To:** Shahnoun shahnoun@whiterockint.com, **Adnan Haider** ahaider@whiterockint.com
**Cc:** Andrea Michelli-Lopez andrea@optimumadvisors.net

Sent from my iPhone

Begin forwarded message:

**From:** Scott Houston <Scott.Houston@icd.gov.ae>
**Date:** 19 May 2016 13:47:35 BST
**To:** Javier Uribarren <javier@optimumadvisors.net>, Scott Houston <Scott.Houston@icd.gov.ae>
**Cc:** Hisham Sherif <H.Sherif@icd.gov.ae>
**Subject:** RE: RE:

Hi Javier,

Ok that's fine. During the site visit it will be helpful for your team to present what has been done thus far and what further testing may be required.

Thanks,



**Scott Houston | Vice President - Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071332
Mobile: +971566824224 | Fax: +97147071444
Email: Scott.Houston@icd.gov.ae | Web: www.icd.gov.ae

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Thursday, May 19, 2016 2:47 PM
**To:** Scott Houston <Scott.Houston@icd.gov.ae>
**Cc:** Hisham Sherif <H.Sherif@icd.gov.ae>
**Subject:** RE: RE:

Hi Scott,

The agronomers in their preliminary reports are mostly interested in grassland quality as that affects the productivity of the operation. Once the non binding letter of intent is signed, they will carry out soil quality tests to rule out any potential water contamination which is highly unlikely. The soil type in the area is relatively standard between neighbouring properties.

That plan works perfectly for us. We have already been in touch with the owners of El Maximo to arrange access on the Sunday and Westby on Monday. By the way, do Khalifa and Simon have any particularly preference for food on Sunday night?

Regards,
Javier

**From:** Scott Houston [mailto:Scott.Houston@icd.gov.ae]
**Sent:** 19 May 2016 10:52
**To:** Javier Uribarren <javier@optimumadvisors.net>
**Cc:** Hisham Sherif <H.Sherif@icd.gov.ae>
**Subject:** RE: RE:

Hi Javier

Many thanks - have your agronomers conducted any testing of the soil? If so, do you have the test result/ agronomer report? I'm not sure if this would normally be conducted as part of the preliminary due diligence?

Just to confirm, our Deputy CEO, Mr. Khalifa Al Daboos will arrive in Orlando at 1140 on 29th May as previously discussed. Simon will be on the same flight. The plan is to visit El Maximo that afternoon and return to Orlando late afternoon/ early evening for dinner. On the 30th the plan leave the hotel early morning and tour Westby before returning to Orlando airport for mid-day.

Kind regards,



**Scott Houston | Vice President - Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071332
Mobile: +971566824224 | Fax: +97147071444
Email: Scott.Houston@icd.gov.ae | Web: www.icd.gov.ae

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Thursday, May 19, 2016 1:34 PM
**To:** Scott Houston <Scott.Houston@icd.gov.ae>
**Subject:** RE:

Hi Scott,

I've attached some aerial maps including the wells in place together with the different property areas showing the type of grass in place in each of them. Hermothria and bahia are very good quality grasses which allow for greater carrying capacity for cattle. Below please find a link to the history of the ranch and the family who initially set the business up. Hope it makes interesting reading and gives you a good perspective into the historical significance of the property.

http://www.lattmaxcy.com/heritage/index.html

Regards,
Javier

**From:** Scott Houston [mailto:Scott.Houston@icd.gov.ae]
**Sent:** 18 May 2016 13:35
**To:** Javier Uribarren <javier@optimumadvisors.net>
**Subject:** RE:

Great, thanks.

As mentioned on the call, any property specific information will be helpful in relation to recent history & utilization, soil quality, topographical schematics etc.

Thanks,



**Scott Houston | Vice President - Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071332
Mobile: +971566824224 | Fax: +97147071444
Email: Scott.Houston@icd.gov.ae | Web: www.icd.gov.ae

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Wednesday, May 18, 2016 4:32 PM
**To:** Scott Houston <Scott.Houston@icd.gov.ae>
**Subject:**

Hi Scott,

Thanks for your call earlier. Just to keep you in the loop, we are looking into hotels as the one I had in mind is fully booked. Either way, rest assured that we will find an appropriate choice.

I will also send you some of the El Maximo preliminary information tomorrow to ensure that your team has plenty of time to review it prior to their trip.

Please do not hesitate to contact me for anything you need.

Regards,
Javier

Javier Uribarren
Partner
48 Dover Street
London W1S 4FF

DD +44 (0) 20 7038 6227
M  +44 (0) 7957 554417

www.optimumagri.com



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.

EXPO 2020 إكسبو
دبي. الإمـــارات العربيـة المتحــدة
DUBAI, UNITED ARAB EMIRATES

This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.

# EXHIBIT E



**From:** javier@optimumadvisors.net
**Subject:** Fwd: Thank you
**Date:** June 14, 2016 at 9:11 PM
**To:** Shahnoun shahnoun@whiterockint.com, Adnan Haider ahaider@whiterockint.com
**Cc:** Andrea MIchelli-Lopez andrea@optimumadvisors.net

Sent from my iPhone

Begin forwarded message:

**From:** javier@optimumadvisors.net
**Date:** 14 June 2016 13:16:05 BST
**To:** Simon Harland <Simon.Harland@icd.gov.ae>
**Subject:** Re: Thank you

Hi Simon,
Thanks for your email. Totally understood. Just tried giving you a ring. Could you please call me when you have 2 mins? My mobile is +447957554417.
Javier

Sent from my iPhone

On 14 Jun 2016, at 12:10, Simon Harland <Simon.Harland@icd.gov.ae> wrote:

Dear Javier

Thank you very much for the proposed itinerary.

In terms of our discussions around when is an appropriate point to submit a non-binding offer letter, and having considered this internally, we are not comfortable doing so until the consultant-led review is completed, which based on the itinerary would hopefully be done by the w/c 27th July.

We appreciate that there is other interest in the property and although our proposed approach carries risk, we think it is important to be fully committed from the outset of any process that we or our advisors, acting on our behalf, engage in and this is ultimately in everybody's interests.

If you are comfortable with this, we can move forward with organizing the visit and pushing the consultant to conclude asap.

Regards
Simon

<image001.gif>
**Simon Harland | Head of Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071309
Mobile: +971508885813 | Fax: +97147071444
Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Friday, June 10, 2016 12:36 PM
**To:** Simon Harland <Simon.Harland@icd.gov.ae>
**Cc:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Scott Houston <Scott.Houston@icd.gov.ae>; Hisham Sherif <H.Sherif@icd.gov.ae>; Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>

**Subject:** RE: Thank you

Dear all,

Following yesterday's call, I have detailed below a 2 day plan for the Arkansas visit. We would be very happy to show your consultant the Florida operation as well but, if time is limited and given that you have already travelled there, I think it would be best for them to spend most of their time seeing our mature operation in Arkansas as that will give them a much better idea of the evolution of the group over the last 10 years.

Little Rock is a great base as we have a cluster of farms within a 1 hour driving distance. They could also visit our main office in Arkansas and the rice mill.

Ideally, we would suggest that they arrive on the morning of the 21st and they could leave on the 22nd in the evening. Unfortunately we cannot do the 20th as we have another group visiting on that day.

21 June

- Arrival in Little Rock. We will pick them up in the airport and drive them to Pine Bluff  (one hour drive) which is the centre of our operations in Arkansas
- Lunch in the office
- Afternoon visiting 4-5 of our local farms with distinct crops including corn, soybeans and rice
- Dinner in Pine Bluff Country Club
- Overnight in Pine Bluff

22 June

- Morning spent overseeing our production facilities in Pine Bluff including the rice mill, storage, drying plants, etc.
- Lunch in the office
- Early afternoon in the office discussing our future business goals and the tailored services we offer our clients including detailed modelling, ongoing reporting, obtaining subsidies/financing, etc
- Early evening tranfer back to Little Rock

If they are interested, we could also drive 3 hrs south of Little Rock to visit our ranch in Texaarkana but this would require an extra day. We could also visit our operations in Louisiana but that would also imply a longer drive.

Please let me know what you think. We would happily rearrange the agenda to suit your needs.

Regards,
Javier

**From:** Simon Harland [mailto:Simon.Harland@icd.gov.ae]
**Sent:** 08 June 2016 14:12

**To:** javier@optimumadvisors.net
**Cc:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Scott Houston
<Scott.Houston@icd.gov.ae>; Hisham Sherif <H.Sherif@icd.gov.ae>; Andrea MIchelli-Lopez
<andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** RE: Thank you

Dear Javier

Tomorrow is fine. Can we do 5pm Dubai time?

Thanks
Simon

<image001.gif>
**Simon Harland | Head of Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071309
Mobile: +971508885813 | Fax: +97147071444
Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae

**From:** javier@optimumadvisors.net [mailto:javier@optimumadvisors.net]
**Sent:** Wednesday, June 8, 2016 5:05 PM
**To:** Simon Harland <Simon.Harland@icd.gov.ae>
**Cc:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Scott Houston
<Scott.Houston@icd.gov.ae>; Hisham Sherif <H.Sherif@icd.gov.ae>; Andrea MIchelli-Lopez
<andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** Re: Thank you

Dear Simon,

Thanks for getting in touch.

Would you mind if we had the call tomorrow at anytime after 7am Miami / 3pm Dubai?

Gaston and Andrea are visiting farms with investors today and they are tied up for most of
the day.

Please let me know what time works best for you tomorrow and I look forward to catching
up.

Regards,
Javier

Sent from my iPhone

On 8 Jun 2016, at 12:10, Simon Harland <Simon.Harland@icd.gov.ae> wrote:

> Dear Javier
>
> Thank you for your email and sorry for the delay in responding. The trip was
> very much worthwhile, it was good to see the property first hand. Are you
> free for a call today or tomorrow to discuss next steps?

Regards
Simon

<image001.gif>
**Simon Harland | Head of Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071309
Mobile: +971508885813 | Fax: +97147071444
Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Thursday, June 2, 2016 2:29 PM
**To:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Simon Harland
<Simon.Harland@icd.gov.ae>; Scott Houston <Scott.Houston@icd.gov.ae>;
Hisham Sherif <H.Sherif@icd.gov.ae>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston
Marquevich <gaston@optimumadvisors.net>
**Subject:** Thank you

Dear all,

Thank you for the time you have all devoted to researching the opportunity
of investing in El Maximo.

Khalifa and Simon, we are particularly grateful for the effort you have made
to visit the property. It is a very long way to travel for such a short period of
time. We very much enjoyed meeting both of you and we hope that your trip
was worthwhile.

Have a relaxing weekend and we remain at your disposal for anything you
need.

Regards,


Javier Uribarren
Partner

Optimum Agriculture
600 Brickel Avenue
Suite 1570
Miami, FL 33131

M   +44 (0) 7957 554417




This e-mail and any attachments are confidential and may be privileged or
otherwise protected. No confidentiality or privilege is waived or lost by any error in

transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.

Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.

Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.

Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



# EXHIBIT F

**From:** javier@optimumadvisors.net
**Subject:** Re: Thank you
**Date:** June 5, 2016 at 2:55 AM
**To:** Shahnoun Zaman shahnoun@whiterockint.com
**Cc:** Adnan Haider ahaider@whiterockint.com



Cool perfect.

Sent from my iPhone

On 4 Jun 2016, at 22:24, Shahnoun Zaman <shahnoun@whiterockint.com> wrote:

> No one is chasing but we are in touch with ICD on other opportunities and therefore would like to be in the loop with discussions so we are not caught looking ignorant.
>
> Chasing now would hurt because that would show we have no other buyers lifting the current offer and show desperation.
>
> Sent from my BlackBerry 10 smartphone.
>
> **From:** javier@optimumadvisors.net
> **Sent:** Saturday, 4 June 2016 17:17
> **To:** Shahnoun
> **Cc:** Adnan Haider
> **Subject:** Re: Thank you
>
> I will do but this is not the time to chase. Patience is key. Let's wait for them to get in touch.
>
> Sent from my iPhone
>
> On 2 Jun 2016, at 20:42, Shahnoun <shahnoun@whiterockint.com> wrote:
>
>> Javi,
>>
>> Please keep us looped in the conversations going forth so that we can follow through accordingly when we are in Dubai.
>>
>> Thanks.
>>
>> Kind Regards,
>>
>> Shahnoun Zaman, CFA
>> Managing Director
>> White Rock International
>> Tel. No.: +971504287833
>> Email: shahnoun@whiterockint.com
>> URL: www.WhiteRockInt.com
>>
>> On Jun 2, 2016, at 6:31 AM, Javier Uribarren <javier@optimumadvisors.net> wrote:
>>
>>> fyi
>>>
>>> **From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
>>> **Sent:** 02 June 2016 11:29
>>> **To:** 'khalifa.aldaboos@icd.gov.ae' <khalifa.aldaboos@icd.gov.ae>; 'Simon Harland' <Simon.Harland@icd.gov.ae>; 'Scott Houston' <Scott.Houston@icd.gov.ae>; 'Hisham Sherif' <H.Sherif@icd.gov.ae>
>>> **Cc:** Andrea Michelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
>>> **Subject:** Thank you
>>>
>>> Dear all,
>>>
>>> Thank you for the time you have all devoted to researching the opportunity of investing in El Maximo.

Khalifa and Simon, we are particularly grateful for the effort you have made to visit the property. It is a very long way to travel for such a short period of time. We very much enjoyed meeting both of you and we hope that your trip was worthwhile.

Have a relaxing weekend and we remain at your disposal for anything you need.

Regards,


Javier Uribarren
Partner

Optimum Agriculture
600 Brickel Avenue
Suite 1570
Miami, FL 33131

M   +44 (0) 7957 554417

# EXHIBIT G



**From:** javier@optimumadvisors.net
**Subject:** Fwd: Thank you
**Date:** June 14, 2016 at 9:11 PM
**To:** Shahnoun shahnoun@whiterockint.com, **Adnan Haider** ahaider@whiterockint.com
**Cc:** Andrea MIchelli-Lopez andrea@optimumadvisors.net

Sent from my iPhone

Begin forwarded message:

**From:** javier@optimumadvisors.net
**Date:** 14 June 2016 13:16:05 BST
**To:** Simon Harland <Simon.Harland@icd.gov.ae>
**Subject:** Re: Thank you

Hi Simon,
Thanks for your email. Totally understood. Just tried giving you a ring. Could you please call me when you have 2 mins? My mobile is +447957554417.
Javier

Sent from my iPhone

On 14 Jun 2016, at 12:10, Simon Harland <Simon.Harland@icd.gov.ae> wrote:

> Dear Javier
>
> Thank you very much for the proposed itinerary.
>
> In terms of our discussions around when is an appropriate point to submit a non-binding offer letter, and having considered this internally, we are not comfortable doing so until the consultant-led review is completed, which based on the itinerary would hopefully be done by the w/c 27th July.
>
> We appreciate that there is other interest in the property and although our proposed approach carries risk, we think it is important to be fully committed from the outset of any process that we or our advisors, acting on our behalf, engage in and this is ultimately in everybody's interests.
>
> If you are comfortable with this, we can move forward with organizing the visit and pushing the consultant to conclude asap.
>
> Regards
> Simon
>
>
> <image001.gif>
> **Simon Harland | Head of Mergers and Acquisitions**
> Tel: +97147071333 (Gen) | Direct: +97147071309
> Mobile: +971508885813 | Fax: +97147071444
> Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae
>
>
> **From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
> **Sent:** Friday, June 10, 2016 12:36 PM
> **To:** Simon Harland <Simon.Harland@icd.gov.ae>
> **Cc:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Scott Houston
> <Scott.Houston@icd.gov.ae>; Hisham Sherif <H.Sherif@icd.gov.ae>; Andrea MIchelli-Lopez
> <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>

**Subject:** RE: Thank you

Dear all,

Following yesterday's call, I have detailed below a 2 day plan for the Arkansas visit. We would be very happy to show your consultant the Florida operation as well but, if time is limited and given that you have already travelled there, I think it would be best for them to spend most of their time seeing our mature operation in Arkansas as that will give them a much better idea of the evolution of the group over the last 10 years.

Little Rock is a great base as we have a cluster of farms within a 1 hour driving distance. They could also visit our main office in Arkansas and the rice mill.

Ideally, we would suggest that they arrive on the morning of the 21st and they could leave on the 22nd in the evening. Unfortunately we cannot do the 20th as we have another group visiting on that day.

21 June

- Arrival in Little Rock. We will pick them up in the airport and drive them to Pine Bluff (one hour drive) which is the centre of our operations in Arkansas
- Lunch in the office
- Afternoon visiting 4-5 of our local farms with distinct crops including corn, soybeans and rice
- Dinner in Pine Bluff Country Club
- Overnight in Pine Bluff

22 June

- Morning spent overseeing our production facilities in Pine Bluff including the rice mill, storage, drying plants, etc.
- Lunch in the office
- Early afternoon in the office discussing our future business goals and the tailored services we offer our clients including detailed modelling, ongoing reporting, obtaining subsidies/financing, etc
- Early evening tranfer back to Little Rock

If they are interested, we could also drive 3 hrs south of Little Rock to visit our ranch in Texaarkana but this would require an extra day. We could also visit our operations in Louisiana but that would also imply a longer drive.

Please let me know what you think. We would happily rearrange the agenda to suit your needs.

Regards,
Javier

**From:** Simon Harland [mailto:Simon.Harland@icd.gov.ae]
**Sent:** 08 June 2016 14:12

**To:** javier@optimumadvisors.net
**Cc:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Scott Houston
<Scott.Houston@icd.gov.ae>; Hisham Sherif <H.Sherif@icd.gov.ae>; Andrea MIchelli-Lopez
<andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** RE: Thank you

Dear Javier

Tomorrow is fine. Can we do 5pm Dubai time?

Thanks
Simon

<image001.gif>
**Simon Harland | Head of Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071309
Mobile: +971508885813 | Fax: +97147071444
Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae

**From:** javier@optimumadvisors.net [mailto:javier@optimumadvisors.net]
**Sent:** Wednesday, June 8, 2016 5:05 PM
**To:** Simon Harland <Simon.Harland@icd.gov.ae>
**Cc:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Scott Houston
<Scott.Houston@icd.gov.ae>; Hisham Sherif <H.Sherif@icd.gov.ae>; Andrea MIchelli-Lopez
<andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** Re: Thank you

Dear Simon,

Thanks for getting in touch.

Would you mind if we had the call tomorrow at anytime after 7am Miami / 3pm Dubai?

Gaston and Andrea are visiting farms with investors today and they are tied up for most of
the day.

Please let me know what time works best for you tomorrow and I look forward to catching
up.

Regards,
Javier

Sent from my iPhone

On 8 Jun 2016, at 12:10, Simon Harland <Simon.Harland@icd.gov.ae> wrote:

> Dear Javier
>
> Thank you for your email and sorry for the delay in responding. The trip was
> very much worthwhile, it was good to see the property first hand. Are you
> free for a call today or tomorrow to discuss next steps?

Regards
Simon

&lt;image001.gif&gt;
**Simon Harland | Head of Mergers and Acquisitions**
Tel: +97147071333 (Gen) | Direct: +97147071309
Mobile: +971508885813 | Fax: +97147071444
Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Thursday, June 2, 2016 2:29 PM
**To:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>; Simon Harland
<Simon.Harland@icd.gov.ae>; Scott Houston <Scott.Houston@icd.gov.ae>;
Hisham Sherif <H.Sherif@icd.gov.ae>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston
Marquevich <gaston@optimumadvisors.net>
**Subject:** Thank you

Dear all,

Thank you for the time you have all devoted to researching the opportunity
of investing in El Maximo.

Khalifa and Simon, we are particularly grateful for the effort you have made
to visit the property. It is a very long way to travel for such a short period of
time. We very much enjoyed meeting both of you and we hope that your trip
was worthwhile.

Have a relaxing weekend and we remain at your disposal for anything you
need.

Regards,


Javier Uribarren
Partner

Optimum Agriculture
600 Brickel Avenue
Suite 1570
Miami, FL 33131

M   +44 (0) 7957 554417




---

This e-mail and any attachments are confidential and may be privileged or
otherwise protected. No confidentiality or privilege is waived or lost by any error in

transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.



# EXHIBIT H

From: javier@optimumadvisors.net
Subject: Re: El Maximo valuation
Date: August 4, 2016 at 3:23 PM
To: Shahnoun Zaman shahnoun@whiterockint.com
Cc: Adnan Haider ahaider@whiterockint.com, Andrea MIchelli-Lopez andrea@optimumadvisors.net, Gaston Marquevich gaston@optimumadvisors.net

Ok no probs

Sent from my iPhone

On 4 Aug 2016, at 11:54, Shahnoun Zaman <shahnoun@whiterockint.com> wrote:

> Could you please copy us on the emails for the only reason that when we need to follow up we have somewhere to pick up from and simon sees that we are working together and not separately?
>
>
> Sent from my BlackBerry 10 smartphone.
> **From:** Javier Uribarren
> **Sent:** Thursday, 4 August 2016 13:57
> **To:** Shahnoun Zaman; Adnan Haider
> **Cc:** Andrea MIchelli-Lopez; Gaston Marquevich
> **Subject:** FW: El Maximo valuation
>
> FYI. I'm making this our number one priority and we should have it completed in the next 48 hours.
>
> **From:** Simon Harland [mailto:Simon.Harland@icd.gov.ae]
> **Sent:** 04 August 2016 10:55
> **To:** Javier Uribarren <javier@optimumadvisors.net>
> **Subject:** RE: El Maximo valuation
>
> That would be great
>
> Thanks
> Simon
>
> <image001.gif>
> **Simon Harland | Head of Mergers and Acquisitions**
> Tel: +97147071333 (Gen) | Direct: +97147071309
> Mobile: +971508885813 | Fax: +97147071444
> Email: Simon.Harland@icd.gov.ae | Web: www.icd.gov.ae
>
> **From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
> **Sent:** Thursday, August 4, 2016 1:54 PM
> **To:** Simon Harland <Simon.Harland@icd.gov.ae>
> **Subject:** El Maximo valuation
>
> Hi Simon,
>
> Thanks for your time yesterday.
>
> We are preparing a detailed study regarding realized transactions in Central Florida land in 2015 so that you can use that as a reference in your evaluation of El Maximo. We hope to be able to send it you by this weekend.

Looking at closed transactions should allow you to better compare the relative pricing of the various ranches.

Please let me know if you require anything further.

Regards,
Javier



This e-mail and any attachments are confidential and may be privileged or otherwise protected. No confidentiality or privilege is waived or lost by any error in transmission. If you are not the intended recipient, please contact the sender and delete this e-mail and any attachments from your system immediately.  You must not, directly or indirectly, use, copy, circulate, print or disclose any part of the message if you are not the intended recipient.
Investment Corporation of Dubai accepts no liability or responsibility for the improper or incomplete transmission of this e-mail, any delay in its transmission, or damage caused to your system as a result of transmission.

# EXHIBIT I



From: **Javier Uribarren** javier@optimumadvisors.net
Subject: FW: El Maximo - additional analysis
Date: October 4, 2016 at 2:35 PM
To: Shahnoun Zaman CFA shahnoun@whiterockint.com, Adnan Haider ahaider@whiterockint.com
Cc: Andrea MIchelli-Lopez andrea@optimumadvisors.net

From: Javier Uribarren [mailto:javier@optimumadvisors.net]
Sent: 03 October 2016 17:00
To: 'Hisham Sherif' <H.Sherif@icd.gov.ae>
Cc: 'Scott Houston' <Scott.Houston@icd.gov.ae>; Gaston Marquevich
<gaston@optimumadvisors.net>; Andrea MIchelli-Lopez <andrea@optimumadvisors.net>
Subject: El Maximo - additional analysis

Hi Hisham,

Thanks for your time earlier. You are quickly becoming an expert in this field! I've attached a
graph showing the effect of basis on corn prices. It cuts out Florida but it clearly shows that the
further away the delivery of corn is from traditional production areas, the higher the basis.
Currently, Central Florida basis is 75bps (over 20% above Chicago prices). We believe that
producing up to 10,000 acres of corn at El Maximo would be a great way to increase returns
while having a minimal effect on basis. It is a crop that is quick to plant, incurs low operational
costs and can be integrated into the cattle business. The extra price achievable on corn thanks
to basis together with the revalued price of farming land after conversion would ultimately lead
to a higher IRR in the short term. As we discussed, we would recommend installing a drying
facility and building storage for corn in the farm to maximise profits.

The article below explains basis in more detail but most of the difference between the futures
price and market price is as a result of transportation costs.

https://www.extension.iastate.edu/agdm/crops/html/a2-40.html

I'm working on the farming split and crop economics as we speak and I will forward you our
projections tomorrow.

Regards,
Javier





# EXHIBIT J

From: **Javier Uribarren** javier@optimumadvisors.net
Subject: RE: El Maximo
Date: October 24, 2016 at 3:55 PM
To: Adnan Haider ahaider@whiterockint.com
Cc: Andrea MIchelli-Lopez andrea@optimumadvisors.net, Gaston Marquevich gaston@optimumadvisors.net, Shahnoun Zaman
shahnoun@whiterockint.com

Hey, good to talk Adnan and clear things up. Lets work together on this and close the deal which is the important thing.
Im sure this will be the first of many in the ME

**From:** Adnan Haider [mailto:ahaider@whiterockint.com]
**Sent:** 24 October 2016 12:38
**To:** Javier Uribarren <javier@optimumadvisors.net>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich
<gaston@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** RE: El Maximo
**Importance:** High

Javier

We need to be copied on **ALL** messages to White Rock's clients.  We have been involved as a strategic partner with you since day one, and continue to push Optimum Agri in the broader Middle East.  We are your strategic representatives in the region .  Moreover, as you know, we are not just basic introducers. We have added value on creating and editing your Presentations, fixing your track record slides, going out of our way on the road shows, investing sharia structuring idea, review and structure financial models, etc

On all previous emails, specific to ICD, we were not copied. We raised this point before.  We helped revive this deal as it was near dead.  We met the ICD team and represented WhiteRock together with Optium to revive this.  We even discussed just this morning that it would be best for you to have a direct call with Simon (rather than insisting we take that message, as we should have), and that we are a team.   And now, you even suggest that we don't even attend the meeting with our clients.
This is not very professional and certainly not how we like to work.

Adnan

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** Monday, October 24, 2016 3:18 PM
**To:** Shahnoun <shahnoun@whiterockint.com>; Adnan Haider <ahaider@whiterockint.com>
**Subject:** FW: El Maximo

FYI

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** 24 October 2016 12:17
**To:** 'Khalifa AlDaboos' <Khalifa.AlDaboos@icd.gov.ae>; 'Simon Harland'
<Simon.Harland@icd.gov.ae>

**Cc:** Gaston Marquevich <gaston@optimumadvisors.net>; Andrea MIchelli-Lopez <andrea@optimumadvisors.net>
**Subject:** El Maximo

Dear Khalifa and Simon,

First of all, thank you for your patience throughout the negotiating process with the Members of the Board of El Maximo Ranch. Our objective from the start was to agree the lowest possible price given their starting point at $4,000 per acre. As you can imagine, the Board Members had distinct opinions about what the ultimate selling price should be but, from our perspective, we just wanted to ensure that we obtained a voting majority at a price that ultimately results in the highest future return.

Having been told that they had rejected all offers below $3,500 per acre, we originally put in a formal bid at $3,500 and the seller responded with $3,700. We viewed the significant reduction in price from their starting point as a great move forward in our conversations and we have spent the last few days talking to the President of the Board to try to close the gap within that range. We should have a final answer by Wednesday and we will communicate it to you as soon as we receive it.

In essence, we believe that any price within this range will represent very good value for the buyer. Our original 'fair price' valuation of the property was $3,570 per acre. Please keep in mind that the 'fair price' is based solely on pastureland use but the key to this project is the fact that the land is almost completely clear of woodland and has a very low percentage of wetlands leading to a quick and cheap transformation play into farmland.

From an ownership perspective and, given the attractive entry price, we would like to know whether you would be open to having us as co-investors for up to 10% of the property. Ideally, we would like to crystalize our investment in a set time frame (say, 5 years). After that time we would sell the property or you would have the option to purchase our equity stake following a third party valuation of the property. If you decided to keep it, we would obviously be very happy to continue to operate the land for you.  Our emphasis is always on maximising short term IRRs and, therefore, our goal would be to convert the land as quickly as possible to both increase productivity and maximise land value. We have a minimum return target in our personal investments of 20% p.a. and we would be looking to realize closer to 25% p.a. at El Maximo over 5 years. Our investors tend to hold on to the asset for a much longer time frame as they like the attractive long term cash flows that can be earned post-conversion. However, in our experience, after a quick conversion IRRs start to slowly decrease as the project becomes a typical operating farm where potential for future added value diminishes.

In order to progress our planning, I think it would ideal for Gaston, Andrea, Santos and myself to visit you in Dubai on Sunday. Please let me know if that works from your side and we will spend as much time as you need with you to ensure that we move the project forward as efficiently as possible.

Thank you again for your patience and the confidence you have shown in us from the start of this project and I look forward to hearing from you.

Regards,

Javier Uribarren
Partner
Optimum Advisors

600 Brickel Avenue
Suite 1570
Miami FL 33131

2nd Floor
Medius House
2 Sheraton St
London W1F 8BH
M   +44 (0) 7957 554417
javier@optimumadvisors.net

# EXHIBIT K

From: **Javier Uribarren** javier@optimumadvisors.net
Subject:
Date: October 29, 2016 at 5:08 PM
To: **Shahnoun Zaman** shahnoun@whiterockint.com, **Adnan Haider** ahaider@whiterockint.com, **Andrea Michelli-Lopez** andrea@optimumadvisors.net

Hey guys,

This is a preliminary draft. Let me know what you think as I intend to review it tonight so that I can send it tomorrow morning.

Starting to run out ideas...



El Maximo
Ranch...ry.pptx

# EXHIBIT L

From: javier@optimumadvisors.net
Subject: Re: RE:
Date: October 30, 2016 at 2:41 AM
To: Adnan Haider  ahaider@whiterockint.com
Cc: Shahnoun Zaman  shahnoun@whiterockint.com, Andrea MIchelli-Lopez  andrea@optimumadvisors.net

Thanks Adnan. See below.

Sent from my iPhone

On 29 Oct 2016, at 22:57, Adnan Haider <ahaider@whiterockint.com> wrote:

> Javier
>
> Sorry for the late reply but I was out this evening.  Back home and working the graveyard shift. Looks good.
>
> Just one comment remaining on the sentence you bolded on page 2.
>
> • Our original valuation of El Maximo was $3,570 per gross acre or approximately $4,060 per net acre including 12% of wetlands. This is just above the price of $3,550 per acre that we have been able to achieve after the negotiating process and it represents a 15% discount per net acre compared to the average pastureland sale price in 2015.
>
> First of all, please say that $3550 per **gross** acre.  As you are referring everywhere as gross vs net
> Ok
>
> Moreover, I was trying to work out how you got the 15% discount and could not, on the net acre.  As the 2015 avg is $4780 per net acre, then a 15% discount would price this at $4063 per net acre.  How do you get that?  I was working out using 12% wetlands, but that would put El Maximo at $4034. Or did you use the trees?  And then you also mention on page 1 that the avg wetlands is 20%, so would not a 2015 avg pastureland at $3780 per gross acre put the net acre at $4725?  As this is a bolded statement, just want to be 100% sure that we have the numbers right.
> 3570/.88= 4,057
> 4057/.85=4,772
> Average wetlands in the state is above 20% but last year's sales had, on average, less than 20% water.
>
>
> Another point you could mention somewhere on page 1 is about the Offtake / Integration into the supply chain, and the positives that a ranch like El Maximo may have.  Moreover, there is a shift towards Made in the USA, and El Maximo can shift its production to capture the various demands on the food chain, and be big enough to diversify its risk
> This is part of the prime location comment
>
>
> Thx
> A
>
>
>
> **From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
> **Sent:** Sunday, October 30, 2016 1:36 AM

**To:** Shahnoun Zaman <shahnoun@whiterockint.com>; Adnan Haider
<ahaider@whiterockint.com>; Andrea Michelli-Lopez <andrea@optimumadvisors.net>
**Subject:**

Ok guys... unless I hear any complaints I'm sending the following to ICD first thing tomorrow.
Now I can rest and have a gin&tonic... Lets hope we go fwd with this.

# EXHIBIT M



From: **Javier Uribarren** javier@optimumadvisors.net
Subject: El Maximo
Date: October 30, 2016 at 10:07 AM
To: **Khalifa AlDaboos** Khalifa.AlDaboos@icd.gov.ae, **Simon Harland** Simon.Harland@icd.gov.ae
Cc: **Hisham Sherif** H.Sherif@icd.gov.ae, **Scott Houston** Scott.Houston@icd.gov.ae, **Gaston Marquevich** gaston@optimumadvisors.net, **Andrea Michelli-Lopez** andrea@optimumadvisors.net, **Adnan Haider** ahaider@whiterockint.com, **Shahnoun Zaman** shahnoun@whiterockint.com

Dear Khalifa and Simon,

Hope you are both well.

As discussed with Simon during the weekend we are very pleased to confirm that, after some hard negotiating, the majority of the Board of El Maximo has agreed the sale of the property for $3,550 per acre which is very much on the lower end of the $3,500 -$3,700 range and below our original valuation.

I have attached a short presentation we prepared yesterday highlighting both the case for El Maximo at the achieved price and Optimum's proposed joint venture with ICD in this project. We are confident that, given the agreed purchase price, we can achieve a net return in excess of 20% p.a. over a 5 year time horizon.

I have also included the 2015 Florida listed land sales presentation as I make reference to it in our latest document.

Finally, and in case you haven't seen it already, I think you will find the article below of interest as it highlights the case for investing in hard assets and their relative valuation vs financial assets.

http://www.valuewalk.com/2016/10/buy-real-assets/

Please let us know if you need any further documentation from our side for your internal discussions.

We very much look forward to working together with you in this project and we remain at your disposal for anything you need.

Regards,
Javier



**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** 24 October 2016 12:17
**To:** 'Khalifa AlDaboos' <Khalifa.AlDaboos@icd.gov.ae>; 'Simon Harland' <Simon.Harland@icd.gov.ae>
**Cc:** Gaston Marquevich <gaston@optimumadvisors.net>; Andrea Michelli-Lopez <andrea@optimumadvisors.net>
**Subject:** El Maximo

Dear Khalifa and Simon,

First of all, thank you for your patience throughout the negotiating process with the Members

of the Board of El Maximo Ranch. Our objective from the start was to agree the lowest possible price given their starting point at $4,000 per acre. As you can imagine, the Board Members had distinct opinions about what the ultimate selling price should be but, from our perspective, we just wanted to ensure that we obtained a voting majority at a price that ultimately results in the highest future return.

Having been told that they had rejected all offers below $3,500 per acre, we originally put in a formal bid at $3,500 and the seller responded with $3,700. We viewed the significant reduction in price from their starting point as a great move forward in our conversations and we have spent the last few days talking to the President of the Board to try to close the gap within that range. We should have a final answer by Wednesday and we will communicate it to you as soon as we receive it.

In essence, we believe that any price within this range will represent very good value for the buyer. Our original 'fair price' valuation of the property was $3,570 per acre. Please keep in mind that the 'fair price' is based solely on pastureland use but the key to this project is the fact that the land is almost completely clear of woodland and has a very low percentage of wetlands leading to a quick and cheap transformation play into farmland.

From an ownership perspective and, given the attractive entry price, we would like to know whether you would be open to having us as co-investors for up to 10% of the property. Ideally, we would like to crystalize our investment in a set time frame (say, 5 years). After that time we would sell the property or you would have the option to purchase our equity stake following a third party valuation of the property. If you decided to keep it, we would obviously be very happy to continue to operate the land for you.  Our emphasis is always on maximising short term IRRs and, therefore, our goal would be to convert the land as quickly as possible to both increase productivity and maximise land value. We have a minimum return target in our personal investments of 20% p.a. and we would be looking to realize closer to 25% p.a. at El Maximo over 5 years. Our investors tend to hold on to the asset for a much longer time frame as they like the attractive long term cash flows that can be earned post-conversion. However, in our experience, after a quick conversion IRRs start to slowly decrease as the project becomes a typical operating farm where potential for future added value diminishes.

In order to progress our planning, I think it would ideal for Gaston, Andrea, Santos and myself to visit you in Dubai on Sunday. Please let me know if that works from your side and we will spend as much time as you need with you to ensure that we move the project forward as efficiently as possible.

Thank you again for your patience and the confidence you have shown in us from the start of this project and I look forward to hearing from you.

Regards,


Javier Uribarren
Partner
Optimum Advisors

600 Brickel Avenue
Suite 1570
Miami FL 33131

2<sup>nd</sup> Floor
Medius House
2 Sheraton St
London W1F 8BH
M   +44 (0) 7957 554417
javier@optimumadvisors.net

 

El Maximo          Optimum
Ranch...lan.pdf    Agricul...les.pdf

# EXHIBIT N

From: **Javier Uribarren** javier@optimumadvisors.net
Subject: Follow up
Date: November 22, 2016 at 3:51 PM
To: **Simon Harland** Simon.Harland@icd.gov.ae, **Scott Houston** Scott.Houston@icd.gov.ae, **Hisham Sherif** H.Sherif@icd.gov.ae
Cc: **Gaston Marquevich** gaston@optimumadvisors.net, **Andrea Michelli-Lopez** andrea@optimumadvisors.net, **Adnan Haider** ahaider@whiterockint.com, **Shahnoun Zaman** shahnoun@whiterockint.com

Dear all,

Thank you for taking the time on Sunday to discuss next steps.

The key to expediting the process is to work on all areas simultaneously. In our experience, 4-6 weeks should be sufficient time to complete the transaction. We recognise that this is a new type of asset for you and therefore we would be happy to work together with you to ensure that we achieve our goal within this time frame. We view this as a joint venture agreement and, therefore, it is in both our interests that we coordinate our efforts to run the process efficiently and to minimise potential costs.

The first stage is to secure the asset, as the last thing we want to do is to incur significant costs before we have exclusivity on the property. This should take no more than 1 week. In order to secure the asset we need to do the following:
-   Appoint a joint legal counsel
-   Engage our legal counsel with the seller's counsel with a view to agreeing final terms on the Purchase / Sale Agreement.

To this effect, I have included a joint agreement between ICD/Optimum drafted by KYMP Law which would need to be signed by both parties. Lorenzo Moll Parron is one of the Managing Partners at KYMP and he is a very experienced lawyer in the local agricultural sector. He has a very close working relationship with David Miller (the seller's lawyer) which will be of great help in facilitating the transaction. Lorenzo has advised Optimum on a number of transactions and we have found him to be very professional and efficient. In our experience, it is very important that the lawyer shows 100% dedication as this ensures that any last minute changes are dealt with quickly. As a leading senior lawyer, his typical rate is $650/hour but he will honour our discounted rate of $350/hour.

As soon as the legal counsel is appointed, we would suggest starting the land due diligence. This is made up of three parts:
-   Title search
-   Environmental due diligence
-   Boundary survey

All of them are carried out simultaneously and I have attached a quote for the Environmental due diligence and Boundary survey from a company that is very familiar with the Ranch. The Title search and Environmental due diligence should take no more than 3-4 weeks. Despite the fact that we are appointing a third party for the Environmental due diligence, Optimum will carry its own independent soil / water assessment to get even greater comfort that we are satisfied with the land prior to purchase. The Boundary survey is a lengthier process that can take up to 8-10 weeks. The survey states the limits of the property and calculates its exact acreage. It is this acreage that will determine the final price for the property. However, it is very common for transactions to close before the exact acreage is calculated and to use the number of acres shown in the property's tax evaluation to determine a preliminary price. The final acreage is always very close to the initial estimate and both the buyer and the seller commit to adjusting the property price as soon as the survey is completed after closing.

We would suggest that you start working on your company and tax structuring immediately.

We can also help you to set up local bank accounts and arranging financing as necessary. We estimate that this part of the process should take up to 4 weeks.

The last part is the management agreement and shareholder (JV) agreement. This should take up to 2 weeks to complete and it is something that we can start working on after the property has been secured, giving us plenty of time to finalise it within 4 weeks. We have already disclosed to you our typical management agreement and we should use this as our template. We can both work together with Lorenzo to prepare preliminary drafts for both agreements within the next 10 days and ideally get together around Sunday December 4th to discuss any final details.

Please review the attached information and let me know your availability for arranging a call tomorrow at 5pm Dubai / 1pm London / 7am Arkansas to discuss any questions you may have. Both Gaston and Andrea are in Arkansas this week visiting farms with investors.

Regards,
Javier

Optimum
Agricul...16.pdf

El Maximo
Ranch...ent.pdf

# EXHIBIT O

**From:** javier@optimumadvisors.net
**Subject:** Fwd: El Maximo Purchase Agreement
**Date:** January 1, 2017 at 8:40 PM
**To:** Shahnoun shahnoun@whiterockint.com, ahaider@whiterockint.com



FYI

Sent from my iPhone

Begin forwarded message:

**From:** Javier Uribarren <javier@optimumadvisors.net>
**Date:** 31 December 2016 at 10:35:21 GMT
**To:** Khalifa AlDaboos <Khalifa.AlDaboos@icd.gov.ae>, Simon Harland <Simon.Harland@icd.gov.ae>
**Cc:** Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** El Maximo Purchase Agreement

Dear Khalifa and Simon,

Hope you are both well.

Following your feedback to our previous negotiations with the seller we are pleased to confirm that the seller has agreed to your request to limit the hunting lease in the corner plot to 10 years with no possibility of renewal. Just as a reminder, this lease would be cancelled if we sold the property at any time and we keep 100% of the farming rights in the plot.

We thought it was also very important to take out the seller's right of first refusal to repurchase the hunting lease plot whenever we decide to sell the property as this will provide a full clean title to any future buyer. The seller has recently built a hunt cabin in that plot and asked us to pay $1m in compensation for the building cost as i) we reduced the hunting lease from 50 years to 10 years; ii) the lease is cancellable at any point if we sell and iii) the seller will not have a right of first refusal to repurchase. Having discussed this with Simon on Thursday, it became evident that he wasn't agreeable to paying this compensation. As a result, we told the seller that we would not be purchasing the property unless this clause was excluded and their Board has just agreed to our demands.

As is typical in these types of transactions, the price and purchase agreement negotiations have been lengthy and complicated. However, following these two key alterations, we are now very satisfied with the content of the purchase agreement as we have achieved a full clean title and we will retain 100% of the economic rights of the property.

I have attached the latest version of the purchase agreement which has been forwarded to us by the seller. I will get Lorenzo, our lawyer, to review it and make whatever small legal changes he deems necessary. I look forward to receiving any final changes you may have from your side so that we can proceed with the signatures early next week.

In the meantime, I would like to wish you and your families a happy new year. We are very excited to work together with you in 2017 and making this business a great success.

Regards,
Javier





**JAVIER URIBARREN**
PARTNER
2nd Floor, 2 Sheraton St., London W1F 8BH
t: +44 20 3865 1841 | mobile: +44 7957 554417
600 Brickell Ave., Suite 1570, Miami, Florida 33131
www.optimumadvisors.net

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** 18 December 2016 06:25
**To:** 'Khalifa AlDaboos' <Khalifa.AlDaboos@icd.gov.ae>; 'Simon Harland'
<Simon.Harland@icd.gov.ae>
**Cc:** 'Scott Houston' <Scott.Houston@icd.gov.ae>; 'Hisham Sherif' <H.Sherif@icd.gov.ae>;
Gaston Marquevich <gaston@optimumadvisors.net>; Andrea MIchelli-Lopez
<andrea@optimumadvisors.net>
**Subject:** El Maximo Purchase Agreement

Dear Khalifa and Simon,

Hope you are both well.

As discussed in my conversation with Simon on Thursday, over the last week we have
successfully negotiated a number of amendments to the Purchase Agreement which, from
our perspective, make us comfortable to proceed with the signature early this week. The
seller's lawyer will be sending a revised agreement over the next couple of days which will
include all the changes requested by your group together with the amendments that we
requested which were approved by the Board of El Maximo on Friday.

Most of our changes relate to the terms of the lease back agreement on the corner of the
property. It is very common in Florida for property sellers to retain certain usage rights but
we found the original terms of the lease back to be too onerous. The sellers have owned the
property for many generations and we would like to keep an ongoing rapport with them to
benefit from their detailed knowledge. However, we view this as a financial investment and
we want to ensure that we maximise the profitability of the farm.

The seller originally requested the following terms:
- A 50 year lease with a peppercorn rent for exclusive use of 2,000 acres in the South-
East corner of the property (including the hunt cabin) together with a hunting lease
for the rest of the Southern part of the Ranch. Hunting has no effect on our ability to
farm and improve the land (in fact, it adds small extra revenue) but the exclusive use
that the seller was requesting in the South-East corner would have meant that those
2,000 acres (5% of the total area) would have provided no income.
- There was no exit provision if we wanted to sell the Ranch in the future; this would
have implied that the lease would have been passed on to the next owner after our

exit.

Our revision is largely as follows:

- We have agreed a 10 year lease with a peppercorn rent for a hunting lease from November 1 – April 15 each year ('the hunting season'). This is limited to hunting and recreation only and we would keep full farming rights and, therefore, it wouldn't have any negative impact on the income potential of the Ranch. The rent applies only to the 2,000 acre South-East corner plot (including the 100 acre hunt cabin area for their own use) and it excludes the previous hunting lease area. The seller would have the right to extend the lease to another four 5 year periods at typical hunting lease rates.
- If we decided to sell the property at any time in the future the lease would be cancelled. The current seller would keep the right to repurchase the 2.000 acre plot if we sell the Ranch as long as they are prepared to pay a price equal to the one offered by a third party.

We hope that you are in agreement with this proposal as it has been achieved as a result of constant negotiating and it has now received formal approval by the Board.

Given the competitive bidding that the property is likely to attract in the new year, it is key that we sign the purchase agreement this week. At that point we will have exclusivity on the deal for a 60 day period and the seller would be legally bound to sell the property to us according to the agreed terms. As buyers, we will have the ability to cancel the agreement during those 60 days with no liability whatsoever.

Please let us know if you want to discuss this in more detail or whether you are happy to proceed on this basis.

Regards,
Javier



**JAVIER URIBARREN**
PARTNER
*2nd Floor, 2 Sheraton St., London W1F 8BH*
*t: +44 20 3865 1841 | mobile: +44 7957 554417*
*600 Brickell Ave., Suite 1570, Miami, Florida 33131*
*www.optimumadvisory.net*



PSA.LMC and
Optimum.v4.doc

# EXHIBIT P



**From:** javier@optimumadvisors.net
**Subject:** Re: Concept of catchup
**Date:** April 11, 2017 at 7:16 PM
**To:** Shahnoun shahnoun@whiterockint.com
**Cc:** Adnan Haider ahaider@whiterockint.com, Andrea Michelli-Lopez andrea@optimumadvisors.net

Thanks Shahnoun. Very clear and helpful. Will let u know how it goes

Sent from my iPhone

On 11 Apr 2017, at 15:27, Shahnoun <shahnoun@whiterockint.com> wrote:

Javier,

Good catching up.

Catchup is a concept when a hurdle rate is introduced explicitly talks about the waterfall payment. I'll assume for the sake of simplicity the investment $100mio, the gross MoC is 2x, the hurdle rate is 6% and the the term of investment is 5 years. Carry to be assumed at 80/20 split.

**Example 1: No catchup (This is how I assume you have looked at it previously)**

Total Cash upon exit: $200mio
1. Cash distributions (Cash yield etc) to investor until $100mio is paid back to investor
2. Cash distributions to meet 6% hurdle for 5 years which is 30%; $30mio is paid back to investor
3. The remainder cash of $70mio is to be split 80% ($56mio) to investor and 20% ($14mio) to W1

*Investor makes $186mio and W1 makes $14mio*

**Example 2: 40% catchup**

Total Cash upon exit: $200mio
1. Cash distributions (Cash yield etc) to investor until $100mio is paid back to investor
2. Cash distributions to meet 6% hurdle for 5 years which is 30%; $30mio is paid back to investor
3. Catchup of 40% means W1 catches up to 40% of $30mio which means they are paid $12mio
4. The remainder cash of $58mio ($100mio -$30mio - $12mio) is to be split 80% ($46.4mio) to investor and 20% ($11.6mio) to W1

*Investor makes $176.4mio and W1 makes $23.6mio*

**Example 3: 100% catchup**

Total Cash upon exit: $200mio
1. Cash distributions (Cash yield etc) to investor until $100mio is paid back to investor
2. Cash distributions to meet 6% hurdle for 5 years which is 30%; $30mio is paid back to investor
3. Catchup of 10% means W1 catches up to 100% of $30mio which means they are paid $30mio
4. The remainder cash of $40mio ($100mio -$30mio - $30mio) is to be split 80% ($32mio) to investor and 20% ($8mio) to W1

*Investor makes $162mio and W1 makes $38mio*

As you can see catchup has a massive difference in payout. This concept is common with most PE Funds and historically have been at 100% which have now been recently questioned but 0 catch up is not common. A hurdle rate is definitely associated with a catchup. If no hurdle rate, then you will notice in this case the investor will make $180mio and W1 will make $20mio.

During your discussions tomorrow. I would emphasize a min. management fee for W1 (allowing room for negotiations at a later stage) which may crop up since you will be discussing tax deductibles and a carry of min. 15% just for the purpose of discussions.

Let me know if you need any clarifications otherwise hope the call goes well tomorrow.

Thanks.

Kind Regards,

Shahnoun Zaman, CFA
Managing Director
White Rock International
Tel. No.: +971504287833
URL: www.WhiteRockInt.com

# EXHIBIT Q



**From:** javier@optimumadvisors.net
**Subject:** Fwd: Follow up
**Date:** April 13, 2017 at 3:01 PM
**To:** Shahnoun  shahnoun@whiterockint.com

Fyi

Sent from my iPhone

Begin forwarded message:

**From:** Javier Uribarren <javier@optimumadvisors.net>
**Date:** 13 April 2017 at 08:47:18 BST
**To:** "Mohand Al-Ansari (MiddleEast)" <mohand.al-ansari@pwc.com>, Scott Houston <Scott.Houston@icd.gov.ae>
**Cc:** Hisham Sherif <H.Sherif@icd.gov.ae>, Gaston Marquevich <gaston@optimumadvisors.net>, "David G. Barbeito" <dbarbeito@dpbcpa.com>
**Subject: Follow up**

Dear Mohand,

Thank you for taking the time to get on a call yesterday at such short notice. We very much appreciate the great detailed work your group has carried out on the tax structuring side as it helps to put the whole project into perspective.

As we discussed on the call, apart from some minor issues, there are two main areas (management fees and financing) that we believe that we should focus on to further improve the future IRR of the project as that is the goal for both investors. The suggestions below would also minimise retained capital at the corporate level which you have purposely kept in the blocker as any repatriation prior to unwinding would be subject to WHT.

In our experience management fees in these projects typically range between 2% and 4% p.a. of the value of the investment. As a result of the transformation process, the land value will rise relatively quickly so in order to be conservative we could base the management fee on the original investment instead of the revalued price. We would suggest imputing a 3% management fee to be shared equally between Optimum Agriculture (the U.S. company appointed to operate the land) and ICD. As majority owners of the joint venture, ICD's input into the project will be substantial and they have already allocated a number of internal resources including its Senior Management team which will be instrumental in the success of the project. They will control the majority of the Board and they will be responsible for the ongoing monitoring of the project as well as agreeing on quarterly budgeting and overall business planning.  They have also incurred significant expenses over the last 12 months in terms of the time devoted by their management team and due diligence costs which should be reimbursed.

In terms of financing and, given the 30% WHT on related loans, I would suggest also running the model with $29m of external loans at a 6% rate in order to see the resulting effect on the IRR.

A final point to address would be the timing of the original cashflows. The model's initial capitalization date is 01/04/17 implying that the first nine months of the business there is no revenue creation which we clearly miss-represented.  All the net flows shown for 2018 are received 12 months after capitalization. In order to resolve this, we could simply change the capitalization date to 31/12/17 as this will better reflect the project IRR.

The changes above should insure that corporate taxation over the first few years of the project is minimal and we ultimately fully benefit from the upcoming tax reform which will immediately result in a lower corporate tax rate and an improved IRR.  For illustration purposes only, it would also be very useful if you carried out a return sensitivity analysis using both a 20% and 25% corporate tax rate.

Finalizing this part of the project is our number one priority and we cannot move forward with the rest of the due diligence until this is finalised. As a result, I would suggest having a call later today once your team has had the opportunity to address the scenarios above.

Thank you again for your cooperation and please do not hesitate to get in

touch for anything you need.

Regards,

JAVIER URIBARREN
PARTNER
2nd Floor, 2 Sheraton St., London W1F 8BH
t: +44 20 3865 1841 I mobile: +44 7957 554417
600 Brickell Ave., Suite 1570, Miami, Florida 33131
www.optimumadvisors.net

-----Original Message-----
From: Scott Houston [mailto:Scott.Houston@icd.gov.ae]
Sent: 13 April 2017 06:00
To: javier@optimumadvisors.net
Cc: Hisham Sherif <H.Sherif@icd.gov.ae>; Gaston
<gaston@optimumadvisors.net>; David G. Barbeito <dbarbeito@dpbcpa.com>;
Mohand Al-Ansari (MiddleEast) <mohand.al-ansari@pwc.com>
Subject: RE:

Hi Javier,

I would suggest Mohand Al Ansari who is based in Dubai and can connect you
with the right people from PwC as required.

I have cc'd Mo - please just keep ICD in the loop.

Thanks,

Scott Houston I Vice President - Mergers and Acquisitions
Tel: +97147071333 (Gen) I Direct: +97147071332
Mobile: +971566824224 I Fax: +97147071444
Email: Scott.Houston@icd.gov.ae I Web: www.icd.gov.ae -----Original
Message-----
From: javier@optimumadvisors.net [mailto:javier@optimumadvisors.net]
Sent: Wednesday, April 12, 2017 9.01 PM
To: Scott Houston <Scott.Houston@icd.gov.ae>
Cc: Hisham Sherif <H.Sherif@icd.gov.ae>; Gaston
<gaston@optimumadvisors.net>; David G. Barbeito <dbarbeito@dpbcpa.com>
Subject:

Hi Scott,

Who can we coordinate with at PWC to ensure that we expedite the project?

We can keep you copied in the correspondence if you prefer.

Thanks,
Javier

Sent from my iPhone


#########################################################################
###########
This e-mail and any attachments are confidential and may be privileged or
otherwise protected. No confidentiality or privilege is waived or lost by
any error in transmission. If you are not the intended recipient, please
contact the sender and delete this e-mail and any attachments from your
system immediately.  You must not, directly or indirectly, use, copy,
circulate, print or disclose any part of the message if you are not the
intended recipient.

Investment Corporation of Dubai accepts no liability or responsibility for
the improper or incomplete transmission of this e-mail, any delay in its
transmission, or damage caused to your system as a result of transmission.


#########################################################################
###########

# EXHIBIT R

From: **Javier Uribarren** javier@optimumadvisors.net
Subject: RE: Can we get on a call in 30mins to prepare for tomorrow's call and strategise for ICD.
Date: April 19, 2017 at 10:21 PM
To: Shahnoun shahnoun@whiterockint.com
Cc: Gaston Marquevich gaston@optimumadvisors.net, Adnan Haider ahaider@whiterockint.com

ok

**From:** Shahnoun [mailto:shahnoun@whiterockint.com]
**Sent:** 19 April 2017 19:17
**To:** javier@optimumadvisors.net
**Cc:** Gaston Marquevich <gaston@optimumadvisors.net>; Adnan Haider <ahaider@whiterockint.com>
**Subject:** Re: Can we get on a call in 30mins to prepare for tomorrow's call and strategise for ICD.

Dial in Details in attached pdf. Let's aim for 1030pm dubai time ie. In 15mins.

Thanks.

Kind Regards,

Shahnoun Zaman, CFA
Managing Director
White Rock International
Tel. No.: +971504287833
URL: www.WhiteRockInt.com

# EXHIBIT S



From: **Javier Uribarren** javier@optimumadvisors.net
Subject: RE: Maximo
Date: June 11, 2017 at 1:17 AM
To: Adnan Haider ahaider@whiterockint.com
Cc: Andrea MIchelli-Lopez andrea@optimumadvisors.net, **Gaston Marquevich** gaston@optimumadvisors.net, Shahnoun Zaman
shahnoun@whiterockint.com

Some comments below. We could also suggest increasing the value of the water project area
as the $400/ac ground rent would imply that the value of that part of the property should be
significantly higher. However, I would expect that ICD would question this approach as the
government grant is subject to annual review and could be cancelled at any time.

We could also show the IRR sensitivity to a reduction in corporate tax rate but I know that ICD
don't want to price in any of that.

Any other suggestions would be very welcome. Happy to talk anytime tomorrow.

**From:** Adnan Haider [mailto:ahaider@whiterockint.com]
**Sent:** 08 June 2017 11:35
**To:** Javier Uribarren <javier@optimumadvisors.net>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich
<gaston@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** RE: Maximo

Javier

Thanks for the model.  We had a call with Andrea, have run some amendments and think we
can get to the ICD returns requirements but it requires remodelling some numbers.  We
suggest the following:

1. Amend the Optimum model as follows
   a. Reduce fees to USD 1 million fixed for 5 years
   b. Reduce upfront to USD 500K

The reduction of a. and b. adds only 50bps to NAV. If we were to reduce the performance fee
from 15% to 10% this would add a further 50bps. Overall, this fee basis is not very viable as
we would end up subsidising the project to make it viable. A different option would be to
suggest that they own 100% of the project and we only charge something like 750k a year and
keep 5% performance fee. Essentially we would be telling them that we are aligned because
we are financing the project from our pockets as the cost of our employee base is significantly
higher than 750k but we would participate in the upside.

   c. Amend the Libor curve to take into account the 5 year swap rate. The current 1
      month Libor is 1.09%.  I'm not sure where you got your future rates from but
      either you extrapolate from the yield curve or else use the swap rates. If you
      extrapolate can you send me the calculations you used.  Else I suggest we swap
      into a 5 year fixed on day one, at least for modelling.

I just copied the one month libor rates that ICD/PWC used. The future rates are more
expensive and if we show the swap from day one we are truly screwed as this is even more
expensive.

   d. Increase KAWA loan to USD 20 million and amend interest burden accordingly.
      This assumes the 65% LTV constraint goes away.

This adds another 120ps to NAV but im sure Rabo won't agree to this change. Even if they did

~~This adds another 120bps to NAV but im sure Rabo won't agree to this change. Even if they did,~~ they would change their own financing rates to compensate for the increased risk.

2. Do the same as above but run another scenario where the KAWA loan is refinanced after year 3 with Rabo Bank. Assume the same interest rate for Rabo.

This would add 50 bps using a 20m kawa loan but less with the original 13.25m kawa loan. Keep in mind that this is a minor difference as it only affects the mortage payments in years 4 and 5.

3. Can you run both scenarios under the ICD/PWC model to make sure you get the exact same IRR rates. This will ensure model integrity and make sure we have the same underlying assumptions. For example, I see differences between the two models such as number of cows, loan fees, stamp duty, exit values at year 5, etc etc.

I could do but I rather stick to our model. Theirs is slightly different and I would be forced to copy and paste all their inputs which is not ideal as we want to show that we do our own work.

Once you've had a chance to re-run then we can review again.

Thanks
Adnan



Adnan Haider, CEO
White Rock International
T:      UAE +971 50 151 4027
Email:  ahaider@whiterockint.com
URL:    www.WhiteRockInt.com

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** 08 June 2017 05:24
**To:** Shahnoun <shahnoun@whiterockint.com>; Adnan Haider <ahaider@whiterockint.com>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** Maximo

Hey guys,

See attached for the latest model. Returns come just below 18% net tax / fees.

35% federal tax and 5.5% state tax is a killer.  Optimum fees are base on our preliminary discussions with them. ICD were also prepared to pay an annual incentive but it wasn't well thought out so I've taken it out.

See what you guys think. 20% net target is not easy with current taxation which will shortly

change. You can play with the tax and fess inputs.

I've also attached the original model done by PWC for your reference.

Lets talk anytime tomorrow. Any suggestions very welcome!



**JAVIER URIBARREN**
PARTNER
*2nd Floor, 2 Sheraton St., London W1F 8BH*
*t: +44 20 3865 1841 | mobile: +44 7957 554417*
*600 Brickell Ave., Suite 1570, Miami, Florida 33131*
*www.optimumadvisors.net*

# EXHIBIT T

From: **Adnan Haider** ahaider@whiterockint.com
Subject: RE: Maximo
Date: June 11, 2017 at 10:06 AM
To: Javier Uribarren javier@optimumadvisors.net
Cc: Andrea MIchelli-Lopez andrea@optimumadvisors.net, Gaston Marquevich gaston@optimumadvisors.net, Shahnoun Zaman shahnoun@whiterockint.com

Javier

Few comments

1. Ag America – to model Ag America accordingly of 75m plus Kawa of 20m
2. Water Project – if there is increased tangible value that we can monetize and demonstrate then we should add. I don't know enough about the grant but if the probability of getting it annually is high and it's a program that has been in place before then we should take that into account.  If you want, you can attach a probability factor to the cash flows to take that into account.  As long as we can clearly articulate our assumptions and rationale on this we can then have a discussion with ICD to support our inclusion.
3. Tax – agree that we cannot show sensitivity based on a corporate tax reduction which may or may not happen.  Though we should mention that this is the case in our memo
4. Inflation – we agreed to show sensitivities to growth rates based on historic trends, which we can support.  I believe Gaston mentioned that the long term avg is between 4-5%, and we have modelled a lower number, so we should show a few inflation sensitivities
5. Optimum Fees – We cannot go to ICD and ask them to own 100% of the project as that alters the premise of our discussions. Within the 90/10 scenario, let's revisit our fees once we see the impact of the AgAmerica deal, and see what it takes to hit the magic IRR target but keeping our fees at $1m and 15% should be our target

We also discussed that before sending across our revised model to ICD, we will also need to prepare a structured memo which would clearly and concisely write out all our amendments to the model since it was last shown to ICD along with our rationale.

Regards
A


From: Javier Uribarren [mailto:javier@optimumadvisors.net]
Sent: 11 June 2017 01:18
To: Adnan Haider <ahaider@whiterockint.com>
Cc: Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
Subject: RE: Maximo

Some comments below. We could also suggest increasing the value of the water project area as the $400/ac ground rent would imply that the value of that part of the property should be significantly higher. However, I would expect that ICD would question this approach as the government grant is subject to annual review and could be cancelled at any time.

We could also show the IRR sensitivity to a reduction in corporate tax rate but I know that ICD don't want to price in any of that.

Any other suggestions would be very welcome. Happy to talk anytime tomorrow.

**From:** Adnan Haider [mailto:ahaider@whiterockint.com]
**Sent:** 08 June 2017 11:35
**To:** Javier Uribarren <javier@optimumadvisors.net>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** RE: Maximo

Javier

Thanks for the model.  We had a call with Andrea, have run some amendments and think we can get to the ICD returns requirements but it requires remodelling some numbers.  We suggest the following:

1.  Amend the Optimum model as follows
    a.  Reduce fees to USD 1 million fixed for 5 years
    b.  Reduce upfront to USD 500K
The reduction of a. and b. adds only 50bps to NAV. If we were to reduce the performance fee from 15% to 10% this would add a further 50bps. Overall, this fee basis is not very viable as we would end up subsidising the project to make it viable. A different option would be to suggest that they own 100% of the project and we only charge something like 750k a year and keep 5% performance fee. Essentially we would be telling them that we are aligned because we are financing the project from our pockets as the cost of our employee base is significantly higher than 750k but we would participate in the upside.

    c.  Amend the Libor curve to take into account the 5 year swap rate. The current 1 month Libor is 1.09%.  I'm not sure where you got your future rates from but either you extrapolate from the yield curve or else use the swap rates. If you extrapolated can you send me the calculations you used.  Else I suggest we swap into a 5 year fixed on day one, at least for modelling.
I just copied the one month libor rates that ICD/PWC used. The future rates are more expensive and if we show the swap from day one we are truly screwed as this is even more expensive.

    d.  Increase KAWA loan to USD 20 million and amend interest burden accordingly. This assumes the 65% LTV constraint goes away.
This adds another 120ps to NAV but im sure Rabo won't agree to this change. Even if they did, they would change their own financing rates to compensate for the increased risk.

2.  Do the same as above but run another scenario where the KAWA loan is refinanced after year 3 with Rabo Bank. Assume the same interest rate for Rabo.
This would add 50 bps using a 20m kawa loan but less with the original 13.25m kawa loan. Keep in mind that this is a minor difference as it only affects the mortage payments in years 4 and 5.

3.  Can you run both scenarios under the ICD/PWC model to make sure you get the exact same IRR rates. This will ensure model integrity and make sure we have the same underlying assumptions. For example, I see differences between the two models such as number of cows, loan fees, stamp duty, exit values at year 5, etc etc.

I could do but I rather stick to our model. Theirs is slightly different and I would be forced to copy and paste all their inputs which is not ideal as we want to show that we do our own work.

Once you've had a chance to re-run then we can review again.

Thanks
Adnan



Adnan Haider, CEO
White Rock International
T:      UAE +971 50 151 4027
Email:  ahaider@whiterockint.com
URL:    www.WhiteRockInt.com

**From:** Javier Uribarren [mailto:javier@optimumadvisors.net]
**Sent:** 08 June 2017 05:24
**To:** Shahnoun <shahnoun@whiterockint.com>; Adnan Haider <ahaider@whiterockint.com>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>
**Subject:** Maximo

Hey guys,

See attached for the latest model. Returns come just below 18% net tax / fees.

35% federal tax and 5.5% state tax is a killer.  Optimum fees are base on our preliminary discussions with them. ICD were also prepared to pay an annual incentive but it wasn't well thought out so I've taken it out.

See what you guys think. 20% net target is not easy with current taxation which will shortly change. You can play with the tax and fess inputs.

I've also attached the original model done by PWC for your reference.

Lets talk anytime tomorrow. Any suggestions very welcome!



**JAVIER URIBARREN**
PARTNER
2nd Floor, 2 Sheraton St., London W1F 8BH
t: +44 20 3865 1841 | mobile: +44 7957 554417
600 Brickell Ave., Suite 1570, Miami, Florida 33131
www.optimumadvisors.net

# EXHIBIT U

**From: Javier Uribarren** javier@optimumadvisors.net
Subject: RE: ICD Memo
Date: June 14, 2017 at 2:10 AM
To: Adnan Haider ahaider@whiterockint.com, Gaston Marquevich gaston@optimumadvisors.net
Cc: Andrea MIchelli-Lopez andrea@optimumadvisors.net, Shahnoun Zaman shahnoun@whiterockint.com

Hi guys,

Thank you all for your input and thanks Adnan in particular for your work.

Gaston, I have attached the final memo together with the Rabobank/Kawa term sheets and our model for you to send Khalifa and Simon tonight (copying myself, Andrea, Adnan and Shahnoun).

Lets hope it does the trick!

Javier

**From:** Adnan Haider [mailto:ahaider@whiterockint.com]
**Sent:** 13 June 2017 12:47
**To:** Gaston Marquevich <gaston@optimumadvisors.net>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Javier Uribarren <javier@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** RE: ICD Memo

Gaston

Ok. Shall await comments from the rest of Optimum but we then need to schedule a Skype call amongst us.  The financing issue is key here.  You need to think through the alternatives you have and what you propose you want to do.  I'm not comfortable surprising them with this news.  I'll ask on whatsapp for call time.

A

**From:** Gaston Marquevich [mailto:gaston@optimumadvisors.net]
**Sent:** 13 June 2017 15:40
**To:** Adnan Haider <ahaider@whiterockint.com>
**Cc:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>; Javier Uribarren <javier@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** Re: ICD Memo

Adnan.

My comments below.

**Updates on Financing Strategy**
[need to discuss timing and Optimum's equity contribution here.  We need to have a chat here on the amount of finances you can contribute day one, what discussions you have had with ICD before, what is their expectation of the timing of your contribution and the elements

of alignment of interest.  I need to be 100% comfortable on this approach and not for it to come as a surprise to ICD as this can easily be a deal breaker.  If there are issues we need to highlight them here, and at the very least provide a heads up.  Let's discuss this important facet. ]

GM : I have not conversation with ICD before on Optimum equity. We need to start taking with ICD on getting the 10% financing by ICD.

**Updates on Seller**
[insert brief comment on any updates from seller here. Either seller is looking around, asking about our status, etc etc]

GM : I spoke yesterday with them, they are ready to come back to the deal on the same condition with sign the LOI without seller financing.

**Update on General Market**
[any comments on US agri since last update? If none, then state no movement in market]

GM : we continue to see new investors coming to the area to invest on land without the capacity on managing the land conversion to add value. This mean for us that investors are comfortable with the asset class without active management.



**GASTON MARQUEVICH**
PARTNER

*Optimum Capital Partners*
*600 Brickell Ave., Suite 1570 | Miami, Florida 33131*
*t: 305.537.0800 | f: 305.537.0704 | c: 305.778.6393*
*www.optimumadvisors.net*

CONFIDENTIALITY NOTICE:  The information contained in this message may contain privileged and confidential information, and is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review,

dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact and notify the sender by e-mail reply and destroy all copies of the original message.

CIRCULAR 230 NOTICE:  To ensure compliance with requirements imposed by the IRS Circular 230, we advise you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any matters addressed herein.

On Jun 13, 2017, at 7:19 AM, Adnan Haider <ahaider@whiterockint.com> wrote:

> Gaston
>
> Can you provide your response to the memo asap, whilst we wait for responses from Javi and Andrea.  We all can then have a second review of the draft memo and take it from there.  Once it is updated and ready, then it can be sent to ICD.
>
> Adnan
>
>
> **From:** Gaston Marquevich [mailto:gaston@optimumadvisors.net] 
> **Sent:** 13 June 2017 15:10
> **To:** Andrea MIchelli-Lopez <andrea@optimumadvisors.net>
> **Cc:** Adnan Haider <ahaider@whiterockint.com>; Javier Uribarren <javier@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
> **Subject:** Re: ICD Memo
>
> Can we send the e mail to ICD today ?.
>
> 
>
> **GASTON MARQUEVICH**
> PARTNER
>
> *Optimum Capital Partners*
> *600 Brickell Ave., Suite 1570 | Miami, Florida 33131*
> *t: 305.537.0800 | f: 305.537.0704 | c: 305.778.6393*
> *www.optimumadvisors.net*

CONFIDENTIALITY NOTICE:  The information contained in this message may contain privileged and confidential information, and is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact and notify the sender by e-mail reply and destroy all copies of the original message.

CIRCULAR 230 NOTICE:  To ensure compliance with requirements imposed by the IRS Circular 230, we advise you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated,

is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any matters addressed herein.

On Jun 13, 2017, at 4:25 AM, Andrea MIchelli-Lopez <andrea@optimumadvisors.net> wrote:

> Agreed! Tks for all the comments.

> On 13 Jun 2017, at 09:23, Adnan Haider <ahaider@whiterockint.com> wrote:

>> Ok so we don't mention the potential rate reduction for Kawa at all. That is fine.

>> Once the items in my comments are properly addressed in the memo, then we can review the second draft, and move to final version. The earlier the better I agree.

>> **From:** Andrea MIchelli-Lopez [mailto:andrea@optimumadvisors.net]
>> **Sent:** 13 June 2017 12:20
>> **To:** Adnan Haider <ahaider@whiterockint.com>
>> **Cc:** Javier Uribarren <javier@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
>> **Subject:** Re: ICD Memo

>> Adnan, thanks for the message. They haven't agreed yet and the principal is travelling till Friday. I can push harder a fee discount but knowing ICD best to keep the deal we have in hands today (which is good enough and get us to the numbers we need). We should send this letter today as timing is against us - once Ramadan is over is hard to get hold of anyone over the Summer.

>> On 13 Jun 2017, at 09:04, Adnan Haider <ahaider@whiterockint.com> wrote:

>>> Andrea

>>> Sure. If you think there is a good chance (ie they have agreed in principle based on your discussion but not put it on termsheet) for a 50 bps reduction if and when they are re-engaged, then its worth to at least mention that in the notes section of the memo. On the other hand

if they have not agreed to the idea, then there is a possibility it may not happen, then we don't mention in the notes. In either case, we then retain in the model based on the higher 11.35%

A

**From:** Andrea MIchelli-Lopez [mailto:andrea@optimumadvisors.net]
**Sent:** 13 June 2017 11:51
**To:** Adnan Haider <ahaider@whiterockint.com>
**Cc:** Javier Uribarren <javier@optimumadvisors.net>; Gaston Marquevich <gaston@optimumadvisors.net>; Shahnoun Zaman <shahnoun@whiterockint.com>
**Subject:** Re: ICD Memo

Hi Adnan, we should not wait for Kawa revised interest rate - I will only push for the reduction if ICD is moving again. We need to see they are reengaged before exposing ourselves again to the seller and finance providers. A

On 13 Jun 2017, at 08:33, Adnan Haider <ahaider@whiterockint.com> wrote:

Javi

I've changed this to a Memo format as that looks more professional and easier amongst us 5 to make and track changes.

Few items to note:

On the model, have you taken into account all the terms specific on the Rabo termsheet. For example, (i) upfront charge of $450k, (ii) 70% of debt to be swapped to fixed rate, (iii) amortization from year 2

onwards?

For Kawa, you still used 11.35%.  Andrea mentions they may come back at 10.85%. Let's wait for the revised termsheet, and if the rate reduction is there then remodel.  Also did you model the upfront fee of $200k for Kawa?

For the DWP, why did you add to the land value? Did you take it net of tax? You need to show more details on the calculations and the effects and details of the program  in the note below.

Once all confirmed, then rerun on PWC model to compare model integrity.

Can you also review the other sections of the memo as we need to fill in the blanks in the memo asap, especially issues around financing of equity.

Regards
Adnan


&lt;image001.png&gt;

Adnan Haider, CEO
White Rock International
T:      UAE +971 50 151 4027
Email:
ahaider@whiterockint.com
URL:
www.WhiteRockInt.com

**From:** Andrea MIchelli-

Lopez
[mailto:andrea@optimuma
dvisors.net]
**Sent:** 13 June 2017 09:22
**To:** Javier Uribarren
<javier@optimumadvisors.n
et>
**Cc:** Gaston Marquevich
<gaston@optimumadvisors.
net>; Shahnoun Zaman
<shahnoun@whiterockint.c
om>; Adnan Haider
<ahaider@whiterockint.co
m>
**Subject:** Re: ICD Memo

Javi, I think is excellent. On
the FCF, only comment is
(which does not need to
amortized until July 2019).

On 12 Jun 2017, at 22:24,
Javier Uribarren
<javier@optimumadvisors.n
et> wrote:

Hi guys, this
would be my
proposed
email. We
should include
the revised
Rabo and
Kawa
agreements.
Feel free to
adjust as
necessary.

Dear Khalifa
and Simon,

Hope you are
both well.

Following
Simon's
request to

Shahnoun at WhiteRock, I have asked our team to complete a comprehensive analysis of the expected IRR of the El Maximo project. I have included our analysis for your review and I would suggest having a conference call to explain any questions you may have.

Overall, the 5 year projected IRR for El Maximo is 20.6%.

Please find below the notes and assumptions related to our analysis:

- **Financing:** Over the last week, we have been able to negotiate improved lending terms with Rabobank and Kawa.

Both Rabobank and Kawa have agreed to increase the overall land debt in the structure to 70% LTV (from 65% previously) without altering any terms or covenants. Our intention is to refinance the structure with Rabobank by the end of the second year to further improve the financing terms and to maximise profitability. However, this has not

has not been included in the model.

- **Tax:** Corporate and State taxes have been included at current levels, despite the fact that the new U.S. administration has already confirmed its intention to drastically reduce corporation tax later this year which will have a very positive effect on the projected IRR.
- **Optimum Fees:** For illustration purposes we

s we have kept the closing fee and management fee at the proposed level, while including a flat 15% fee at exit.

- **Dispersed Water Program**: We have reduced the cattle capacity as a result of going forward with the DWP which has recently received final Government approval. As this is a 10 year program, we have added the present value of the income from

from the last 5 years of the program to the land value figure on year 5.

- **FCF:** As the Kawa loan is interest only, the business would be cash flow positive from the start including the repayment of the Rabobank loan (which does need to be amortised until July 2019).

I hope this clarifies our approach and I look forward to discussing it with you at your earliest convenience.

Regards,
Gaston

<El Maximo
Ranch - PL
projection
(operational
model) inc
DWP ICD
Final.xlsx>

<Optimum Memo to ICD -
draft 13.06.2017.docx>

      

Optimum Memo   El Maximo   Optimum   El Maximo
to ICD...17.docx   Ranch...017.pdf   LOI_05....g.docx   Ranch...nal.xlsx

# EXHIBIT V

From: **Gaston Marquevich** gaston@optimumagri.com
Subject: El Maximo Ranch Deal Update
Date: June 14, 2017 at 3:02 AM
To: Khalifa Aldaboos khalifa.aldaboos@icd.gov.ae, Simon Harland Simon.Harland@icd.gov.ae, Scott Houston
Scott.Houston@icd.gov.ae, Leonard Colin Taylor L.taylor@icd.gov.ae, Eric Milne E.Milne@icd.gov.ae
Cc: Adnan Haider ahaider@whiterockint.com, Shahnoun Zaman CFA shahnoun@whiterockint.com, Javier Uribarren
javier@optimumadvisors.net, Andrea Michelli andrea@optimumadvisors.net

Dear Khalifa and Simon,

Hope you are both well.

Following Simon's request to Shahnoun at WhiteRock, I have asked our team to complete a comprehensive analysis of the expected IRR of the El Maximo project. I have included our analysis for your review and I would suggest having a conference call to explain any questions you may have.

Overall, the 5 year projected IRR for El Maximo is 20.6%.

Please find below the notes and assumptions related to our analysis:

- **Financing:** Over the last week, we have been able to negotiate improved lending terms with Rabobank and Kawa. Both Rabobank and Kawa have agreed to increase the overall land debt in the structure to 70% LTV (from 65% previously) without altering any terms or covenants. Our intention is to refinance the structure with Rabobank by the end of the second year to further improve the financing terms and to maximise profitability. However, this has not been included in the model.
- **Tax:** Corporate and State taxes have been included at current levels, despite the fact that the new U.S. administration has already confirmed its intention to drastically reduce corporation tax later this year which will have a very positive effect on the projected IRR.
- **Optimum Fees:** For illustration purposes we have kept the closing fee and management fee at the proposed level, while including a flat 15% fee at exit.
- **Dispersed Water Program:** We have reduced the cattle capacity as a result of going forward with the DWP which has recently received final Government approval. As this is a 10 year program, we have added the present value of the income from the last 5 years of the program to the land value figure on year 5.
- **FCF:** As the Kawa loan is interest only, the business would be cash flow positive from the start including the repayment of the Rabobank loan (which does need to be amortised until July 2019).

I hope this clarifies our approach and I look forward to discussing it with you at your earliest convenience.

Regards,


**GASTON MARQUEVICH**
PARTNER

*Optimum Agriculture*
*600 Brickell Ave., Suite 1570 | Miami, Florida 33131*

*t: 305.537.0800 I f: 305.537.0704 I c: 305.778.6393*
*www.optimumagri.com*

CONFIDENTIALITY NOTICE:  The information contained in this message may contain privileged and confidential information, and is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact and notify the sender by e-mail reply and destroy all copies of the original message.
CIRCULAR 230 NOTICE:  To ensure compliance with requirements imposed by the IRS Circular 230, we advise you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any matters addressed herein.


El Maximo Ranch...nal.xlsx


El Maximo Ranch...017.pdf


Optimum LOI_05....g.docx


Optimum Memo to ICD...17.docx

# EXHIBIT W

From: **Javier Uribarren** javier@optimumadvisors.net
Subject: ICD
Date: January 11, 2018 at 10:13 PM
To: Gaston Marquevich gaston@optimumadvisors.net, Andrea Michelli-Lopez andrea@optimumadvisors.net, Shahnoun Zaman
shahnoun@whiterockint.com, Adnan Haider ahaider@whiterockint.com

Hi guys,

This is what I have prepared to send to ICD tomorrow. I will also include our full model
showing a 20% IRR.

We had a call with Scott today and he was supportive of getting rid of the second lien.

Let me know if you want to make any changes.



**JAVIER URIBARREN**
PARTNER

2nd Floor, 2 Sheraton St., London W1F 8BH
t: +44 20 3865 1841 | mobile: +44 7957 554417
600 Brickell Ave., Suite 1570, Miami, Florida 33131
www.optimumadvisors.net

   

Optimum Memo        El Maximo Term
to ICD...17.docx    Sheet -....18.pdf

# EXHIBIT X

From: **ahaider** ahaider@whiterockint.com
Subject: Re:
Date: May 4, 2018 at 8:18 PM
To: Shahnoun shahnoun@whiterockint.com, javier@optimumadvisors.net
Cc: Gaston Marquevich gaston@optimumadvisors.net, Andrea Michelli-Lopez andrea@optimumadvisors.net



All

Time works for me. However as requested before please send the closing documents and your proposal else the call will not be productive. We are happy to listen to and consider your alternative solution(s) but not before receiving the above. If you still are unable to send then I will need satisfactory justification when we have the call.

Regards
Adnan


Sent from my Samsung Galaxy smartphone.

-------- Original message --------
From: Shahnoun <shahnoun@whiterockint.com>
Date: 2018-05-04 4:12 PM (GMT+04:00)
To: javier@optimumadvisors.net
Cc: Adnan Haider <ahaider@whiterockint.com>, Gaston Marquevich <gaston@optimumadvisors.net>, Andrea Michelli-Lopez <andrea@optimumadvisors.net>
Subject: Re:

Javier,

Thanks for your call today. As discussed, let's all 5 of us jump on a call this Monday at 9pm dubai time. Please do consider what you think is a fair assessment of a "partnership" and we would like to hear how different it is from our base case.

If the timing works for everyone, ill send out a calendar invite with dial in details.

Thanks.

Kind Regards,
Shahnoun Zaman.
Tel. No. +971504287833

On May 1, 2018, at 20:42, javier@optimumadvisors.net wrote:

> Hi, will call quickly you and explain
>
> Sent from my iPhone
>
> On 1 May 2018, at 17:22, Shahnoun <shahnoun@whiterockint.com> wrote:
>
>> Javier,
>>
>> Thanks for taking the time to put this together.
>>
>> However, we are still waiting for the closing documents with ICD. Could you please send them across at your earliest? Also, as discussed during our previous call you mentioned that you would like us to *"partner"* with you on this deal, as a one off exception, so we are keen to see a counter proposal, expressing the partnership, away from our initial agreement which states that we get 25% of all revenues (including origination fee, management fee, operating fee if any, and carry).
>>
>> Finally, I am a little bemused with some of the numbers on the spreadsheet including as to why you're getting 90% (& not 100%) of the fees when they are notionally fixed and mutually agreed by you and ICD. In any case, we can discuss the rational and details of these numbers during a call post receiving the closing docs and a counter proposal.
>>
>> Thanks.
>>
>> Kind Regards,
>>
>> Shahnoun Zaman, CFA
>> Managing Director
>> White Rock International
>> Tel. No.: +971504287833
>> www.WhiteRockInt.com
>>
>>> On May 1, 2018, at 1:12 PM, Javier Uribarren <javier@optimumadvisors.net> wrote:

Hi guys,

I've attached my project calculations. Lets make it all work!!!

Let's all have a call tomorrow once you have had time to review.

Javier

<image001.jpg>

**JAVIER URIBARREN**
PARTNER

2nd Floor, 2 Sheraton St., London W1F 8BH
t: +44 20 3865 1841 | mobile: +44 7957 554417
600 Brickell Ave., Suite 1570, Miami, Florida 33131
www.optimumadvisors.net

<El Maximo Optimum Project Return.xlsx>

# EXHIBIT Y

From: **Javier Uribarren** javier@optimumadvisors.net
Subject:
Date: May 9, 2018 at 10:46 AM
To: Haider Adnan ahaider@whiterockint.com, **Shahnoun** shahnoun@whiterockint.com
Cc: Gaston Marquevich gaston@optimumadvisors.net, Andrea Michelli-Lopez andrea@optimumadvisors.net

Hi guys,

As we discussed in our previous calls, the contract between White Rock and W1 Optimum Partners allocated to White Rock 25% of the net revenues received by W1 Optimum Partners on the understanding that White Rock provided 100% of the equity in the deal (co-investment deals would be covered by a separate agreement and they would be negotiated on a stand alone basis). This differentiated approach was based on the fact that negotiating a general agreement for co-investment deals is very difficult as each of them has its own unique characteristics.

Our initials discussions with ICD were based on ICD providing 100% of the equity but they ultimately forced us to Partner with them and take on 10% of the equity. This has ultimately left us as minority shareholders with no real minority protection as ICD can fire us as operators of the land at any time. In addition, and in order to close the deal, we had to finance part of our equity and provide our lender personal guarantees in case of default (regardless of whether the default is ours with ABS or ICD's with MetLife).

Our preference would be for you to Partner with us by participating in 25% of the revenues of the deal as projected in the attached spreadsheet subject to your provision of 25% of all initial and ongoing equity contributions (capex, additional capital, etc.) and personal guarantees.

If you prefer not to Partner with us and as a sign of goodwill, we would be prepared to discuss with you the following two alternatives:

1) Accelerated cash payments to White Rock up to $600k. Payments from years 1-3 would be made quarterly and they would be stopped if ICD terminate the management agreement at any point.

Closing: $150k (by the end of Q2 2018)
Year 1: $100k
Year 2: $150k
Year 3: $200k

2) One-off payment of $450k payable before the end of Q2 2018.

Look forward to discussing these options with you on the phone.

Regards,
Javier




El Maximo    El Maximo

El Maximo
Optimu...rn.xlsx

El Maximo
Optimu...rn.xlsx

# EXHIBIT Z

From: **Adnan Haider** ahaider@whiterockint.com
Subject: Re:
Date: May 30, 2018 at 12:49 AM
To: Gaston Marquevich gaston@optimumadvisors.net, Andrea Michelli-Lopez andrea@optimumadvisors.net, Javier Uribarren javier@optimumadvisors.net
Cc: **Shahnoun** shahnoun@whiterockint.com, **Adnan Haider** ahaider@whiterockint.com

**STRICTLY PRIVATE AND CONFIDENTIAL**

**WITHOUT PREJUDICE**

Dear Gaston, Javier & Andrea,

*This communication is without prejudice and we reserve the right to take any further action available to us.*

We are disappointed that you have decided to attempt to re-negotiate our agreement after closing the transaction with the Investment Company of Dubai (ICD).

The contract between White Rock and Optimum states under Clause 10 that any disputes as to the commission shall be referred to an independent auditor who shall be appointed by mutual consent. If we are unable to agree on the fees payable to us, then I'm afraid we will have to move towards appointing an independent auditor to carry out a review. We are happy to accept any of the 'big 4' audit firms (provided that the firm is not conflicted) and are open to your suggestions.

As we stated in our previous email and during our phone call, we have a signed agreement between White Rock and Optimum which clearly covers the financial arrangement between our respective firms regarding ICD and all other clients that we bring to you. It states:

> *The Intermediary will be entitled to a Commission fee of 25% of all the revenues generated from each investment introduced by the Intermediary (see Schedule 2 [for list of clients]). The fees may comprise annual management fee, acquisition fee, performance fee, a profit sharing incentive fee and will be negotiated between the Company and the investors on a case by case.*

This clearly refers to all revenues (without deduction of any costs) without question and that is applies to the recent transaction that was successfully closed.  You mentioned that you wish to re-negotiate this agreement despite the valid contract between ourselves and are further refusing to uphold your payment obligations to White Rock thereunder.

Nevertheless, as a gesture of goodwill from us and without prejudice, we are willing to consider a partial conversion of your payment obligations to White Rock into equity of the transaction, effectively cementing the partnership that you state was your original intention. So effectively a (partial) debt for equity swap in the El Maximo transaction.

The following paragraphs describe this potential arrangement.

\* \* \*

The current debt obligations owed to us are, over a period of 5 years, the sum of:

> (1)   Fixed fees of $2,250,000 which is the sum of annual (paid quarterly) management and acquisition fees as per the payment schedule,
> (2)   Performance Fees, which are variable and dependent on final exit of El Maximo, and
> (3) Profit Sharing Fees, which are variable and dependent on the performance of El Maximo and paid annually

***We are not willing to have you re-negotiate items (2) and (3) above. That is, your current obligation to us stands notwithstanding the arrangement described below.***

***However, we are willing to be flexible with item (1) which we can do a partial swap of debt to equity.***

In order for us to accept that, we first require from you the following information:

> (a) The full set of final closing documents of the transaction,
> (b)   A clear response from you on what cash flows have you, as shareholders, provided under the following entities, and any other entities which we may not be aware of and are relevant to the transacton:
>> i.   Optimum El Maximo Partners LLC,
>> ii.   Optimum Farms Florida Ltd.

Once we receive this, we are then willing to match your cash injections (net of any external funding) in the ratio of 75% (collectively by Optimum) and 25% (collectively by White Rock)

White Rock's funding would come from its $2.25 million payment obligations that are due from Optimum to White Rock.

As the ratio is 3:1 in favour of Optimum, this effectively represents and assumes that Optimum has paid out $9 million in cash payments (net of external funding).  For clarity, 75% of $9 million is $6.75 million which is contributed by Optimum, and 25% of $9 million is $2.25 million which is contributed by White Rock.

If Optimum's cash contribution is less than $6.75m, then Optimum can either (a) dilute its shareholding below 75% commensurate with White Rock's cash contribution of $2.25 million, or else pay White Rock an amount in cash (at the previously agreed scheduled dates) to allow Optimum to maintain its 75% shareholding.

If Optimum's cash contribution is more than $6.75m, then White Rock's shareholding will decrease below 25% and will be maintained at a ratio that follows the total cash contribution of both parties.

Our agreement to the above would be subject to:

(a)  The condition that White Rock has direct 25% ownership (or an amount as determined and agreed mutually) in the following legal entities (and any other entities as deemed appropriate) and **not** via a bilateral agreement:

    a.  Optimum El Maximo Partners LLC and

    b.  Optimum Farms Florida Ltd.

(b)  As White Rock would be taking on the cost base in the above noted vehicles, we would have a say on those costs that we also feel are reasonable, which is primarily all interest and payment obligations of the ABS loan. We will not be unreasonable.

(c)  The above noted matter, including legal documents, are completed within 30 days of the date we agree in writing to this arrangement.

You will find our proposal meets the spirit of being partners as well as providing a structure that is less burdensome on Optimum's annual cashflows.

* * *

We look forward to your quick response to resolve this important outstanding matter and come to a mutual agreement. We have no interest to get into a messy situation for the both of us and look forward to working with you on resolving this and working together on other clients in the GCC.

Regards

Adnan & Shahnoun


On 9 May 2018 at 16:56, Shahnoun <shahnoun@whiterockint.com> wrote:
> Javier,
>
> Thanks for reverting back with what you consider alternative options to what is due to WhiteRock. Please find attached the signed agreement between White Rock and Optimum, which covers the financial arrangement between our respective firms regarding Investment Corporation of Dubai and all other clients that we bring to you.
>
> The agreement clearly states the following on page 9 of the agreement:
>
>
> We are perplexed as to why (1) you believe it refers to NET revenues and not ALL revenues, as per above clause stated in the attached agreement, without the deduction of any costs and (2) this is further predicated if and only if the client, in this case ICD, brings in 100% of the equity. There is nothing in the agreement to suggest the fees to the intermediary, subject to a financial close, should differ if the promoter, Optimum, decides to co-invest. The decision to co-invest was solely your decision.
>
> If there is any communication or correspondence that you are aware of that supports your basis of NET revenues rather than ALL revenues as clearly stated in the agreement, then please do share that with us as we are not aware of such an agreement. Can you please send that in advance of the call tonight?
>
> Thanks and await your response.
>
> Kind Regards,
>
> Shahnoun Zaman, CFA
> Managing Director
> White Rock International

Tel. No.: +971504287833
www.WhiteRockInt.com

On May 9, 2018, at 10:46 AM, Javier Uribarren <javier@optimumadvisors.net> wrote:

Hi guys,

As we discussed in our previous calls, the contract between White Rock and W1 Optimum Partners allocated to White Rock 25% of the net revenues received by W1 Optimum Partners on the understanding that White Rock provided 100% of the equity in the deal (co-investment deals would be covered by a separate agreement and they would be negotiated on a stand alone basis). This differentiated approach was based on the fact that negotiating a general agreement for co-investment deals is very difficult as each of them has its own unique characteristics.

Our initials discussions with ICD were based on ICD providing 100% of the equity but they ultimately forced us to Partner with them and take on 10% of the equity. This has ultimately left us as minority shareholders with no real minority protection as ICD can fire us as operators of the land at any time. In addition, and in order to close the deal, we had to finance part of our equity and provide our lender personal guarantees in case of default (regardless of whether the default is ours with ABS or ICD's with MetLife).

Our preference would be for you to Partner with us by participating in 25% of the revenues of the deal as projected in the attached spreadsheet subject to your provision of 25% of all initial and ongoing equity contributions (capex, additional capital, etc.) and personal guarantees.

If you prefer not to Partner with us and as a sign of goodwill, we would be prepared to discuss with you the following two alternatives:

1) Accelerated cash payments to White Rock up to $600k. Payments from years 1-3 would be made quarterly and they would be stopped if ICD terminate the management agreement at any point.

Closing: $150k (by the end of Q2 2018)
Year 1: $100k
Year 2: $150k
Year 3: $200k

2) One-off payment of $450k payable before the end of Q2 2018.

Look forward to discussing these options with you on the phone.

Regards,
Javier

--

Adnan Haider

Managing Partner & CEO

White Rock International

T:       UAE +971 50 151 4027

Email:  ahaider@whiterockint.com

URL:    www.WhiteRockInt.com

# EXHIBIT AA



## WONG FLEMING
### ATTORNEYS AT LAW

DANIEL C. FLEMING
Member of NY, NJ, PA, MD, OH, CA and DC Bars

dfleming@wongfleming.com

January 3, 2019

**VIA FEDERAL EXPRESS OVERNIGHT DELIVERY**
W1 Optimum Partners LLC
600 Brickell Avenue
Suite 1570
Miami FL 33131

> **Re:**   **Past due payment of mandatory commission fee regarding Optimum's business with a client introduced by White Rock**

To Whom It May Concern:

This firm has been retained by White Rock DMCC (the "Intermediary") in connection with their claims against you, W1 Optimum Partners LLC (the "Company"), regarding your mandatory obligation to pay a commission fee of 25% of **all** revenues pursuant to the Terms of Business ("TOB") executed between the Intermediary and you on November 24, 2015. Specifically, the Intermediary is entitled to 25% of all revenues relating the business done with the Investment Corporation of Dubai ("ICD") under the TOB. Schedule 2 clearly establishes that ICD is an investor introduced by the Intermediary. This obligation remains unpaid as of this date.

The Intermediary hereby demands payment of the full amount of what is owed regarding the El Maximo property located on Osceola County, Florida. This includes 25% of the following:

1. Annual management fee: Years 1-3 of $2 million, and Years 4-5 of $1 million, billed quarterly, and then negotiated thereafter (source: Clause 3.1 (b) in El Maximo Management Agreement LMP)

2. Acquisition fee: $1 million paid upfront (source: Clause 3.1 (a) in El Maximo Management Agreement LMP)

3. Performance fee: 15% of Net Exit Proceeds (source: Clause 3.1 (c) and (d) in El Maximo Management Agreement LMP)

4. Profit Sharing Fees, which are variable and dependent on the performance of El Maximo and paid annually.

This obligation is in default and the purpose of this letter is to demand payment in full from you under the TOB. This letter further serves as a reminder that the above referenced obligations are continuing and payment must be made on all future revenue generated from the El Maximo Management Agreement LMP in accordance with the TOB.

821 ALEXANDER ROAD, SUITE 200 ♦ P.O. BOX 3663 ♦ PRINCETON, NJ 08543-3663
TEL: (609) 951-9520 ♦ FAX: (609) 951-0270
WWW.WONGFLEMING.COM

CALIFORNIA ♦ FLORIDA ♦ GEORGIA ♦ ILLINOIS ♦ INDIANA ♦ MICHIGAN
NEW JERSEY ♦ NEW YORK ♦ PENNSYLVANIA ♦ TENNESSEE ♦ TEXAS ♦ WASHINGTON



**WONG·FLEMING**
ATTORNEYS AT LAW

On November 24, 2015, you engaged the services of the Intermediary to promote investments to clients and to submit business to the Company. In return, the Intermediary, under Schedule 1, was entitled to the following:

> Commission fee of 25% of <u>all</u> the revenues generated from each investment introduced by the Intermediary. The fees may compromise annual management fee, acquisition fee, performance fee, a profit-sharing incentive fee and will be negotiated between the Company and the investors on a case by case basis.

Contrary to your suggestion in your May 9, 2018 email, the TOB makes it clear that the commission fee is 25% of **all** revenue and not net revenue. The Intermediary will gladly submit to an independent auditor to determine if all means all or if all means net.

Moreover, your claim that this 25% commission fee is applicable only if 100% of the equity is provided by the client is not supported in the TOB. The TOB does not mention joint-investments and their implications. Instead, under Schedule 1, the 25% commission fee covers all revenues generated from **each** investment introduced by the Intermediary. Again, the Intermediary will gladly submit to an independent auditor to determine if each means every investment or if each means only some investments.

Furthermore, as a gesture of goodwill, the Intermediary provided you with an alternative payment plan on May 30, 2018, at your request. You have not acknowledged the alternative plan as of this date.

You have thirty (30) days to acknowledge your monetary obligations and provide a reasonable payment schedule, continue discussing alternative plans or consent to an independent auditor. Failure to comply will result in a material breach of contract and the Intermediary and this firm will file a lawsuit seeking payment.

Very truly yours,

WONG FLEMING, P.C.

Daniel C. Fleming

DCF/ss
File No. 26750001

1/3/2019

FedEx Ship Manager - Print Your Label(s)



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.